******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# BLOOMFIELD HEALTH CARE CENTER OF CONNECTICUT, LLC *v.* JASON DOYON
## (AC 40281)

DiPentima, C. J., and Prescott and Eveleigh, Js.

*Syllabus*

The plaintiff nursing home sought to recover damages from the defendant, the conservator of the estate of J, for negligence, claiming that the defendant had breached his duty of care to the plaintiff by failing to apply for and to obtain on a timely basis Medicaid benefits on behalf of J that were necessary to pay for the cost of providing care and services to J at its facility. The plaintiff had petitioned the Probate Court to appoint an involuntary conservator to oversee J's estate for the purpose of assisting him with his finances and Medicaid benefits application, and to ensure that it would be compensated for the necessary care it provided to him. The court adjudicated J incapable of managing his financial affairs, granted the plaintiff's petition and appointed the defendant as the conservator of J's estate. The court did not require a probate bond. The defendant then tendered $48,000 in proceeds from the sale of J's home to the plaintiff to be applied to J's outstanding bill, which totaled $124,000. J's only other source of income at that time was social security benefits he received each month, which the defendant began paying over to the plaintiff. Although J did not have sufficient funds or income remaining to pay the $370 per day required for his care, the defendant did not submit an application for J's Medicaid benefits until nine months after his appointment as conservator, and the Department of Social Services denied the application because the defendant did not provide certain information that the department had requested for its completion. Thereafter, the defendant filed a second application. That application was granted, and J's Medicaid benefits were made retroactive to a certain date, but he did not receive any benefits for the cost of his care prior to that date. The plaintiff subsequently commenced the present action, and the defendant filed a motion for summary judgment, which the trial court granted, concluding that the defendant was entitled to judgment as a matter of law because he did not owe any duty of care to the plaintiff solely as a result of his appointment as J's conservator. On the plaintiff's appeal to this court, *held* that the trial court improperly granted the defendant's motion for summary judgment, that court having incorrectly concluded that the defendant did not owe the plaintiff a duty to use reasonable care in performing his duties as conservator of J's estate, which necessarily included timely submitting J's application for Medicaid benefits in order to obtain available public assistance funds for the cost of J's care provided by the plaintiff: the harm suffered by the plaintiff was foreseeable as a matter of law based on the facts that the plaintiff petitioned the Probate Court to appoint an involuntary conservator to J to help him manage his estate, that the petition specifically alleged that J needed help completing an application for Medicaid benefits, that the defendant, as J's conservator, had exclusive access and control over J's assets, income and property, that when the defendant was appointed as conservator of J's estate, J already had accrued several thousands of dollars of debt to the plaintiff and that even though the defendant had tendered $48,000 in proceeds from the sale of J's house to the plaintiff and began paying over his social security checks, J still was unable to pay the $370 per day required to cover the cost of his care and continued to accrue debt to the plaintiff; moreover, because the defendant had disposed of J's assets and was familiar with his finances, he would have been acutely aware of these facts and that his failure to obtain Medicaid benefits for J would result in J's being unable to pay for the necessary care provided to him by the plaintiff, and although he claimed that the harm to the plaintiff was not foreseeable because he was not in privity with the plaintiff, the plaintiff did not need to show that it was in privity with the defendant for this court to determine that the harm suffered by the plaintiff was foreseeable;

furthermore, public policy supported recognizing that the defendant owed a duty to the plaintiff to use reasonable care in the administration and management of J's estate because the parties reasonably could have expected that the defendant would take the steps necessary to secure payment for the cost of J's care, which necessarily included timely completing Johnson's application for Medicaid benefits, and that the defendant could be held liable to the plaintiff if he failed to do so, particularly in light of the defendant's statutory (§ 45a-655 [a]) duties as a conservator of an estate, as well as the fact that the plaintiff's petition for a conservator specifically mentioned that J needed help obtaining Medicaid benefits, the benefits of encouraging conservators to carry out their duties with care and preventing financial harm outweighed any corresponding minimal increase in litigation, and many other states have enacted legislation that permits a third party to bring a statutory cause of action against a conservator if the conservator commits a tort in the course of the administration of the estate or the conservator otherwise is personally at fault for the party's loss, which indicated that the legislatures of those jurisdictions believed that third parties should have a right to recover for harm caused to them by a conservator's negligence.

Argued May 15—officially released October 9, 2018

*Procedural History*

Action to recover damages for the defendant's alleged negligence, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the court, *Scholl, J.*, granted the defendant's motion for summary judgment and rendered judgment thereon, from which the plaintiff appealed to this court. *Reversed*; *further proceedings*.

*Anne Jasorkowski*, with whom, on the brief, was *Angelo Maragos*, for the appellant (plaintiff).

*Lauren A. MacDonald*, with whom, on the brief, was *Timothy R. Scannell*, for the appellee (defendant).

*Opinion*

PRESCOTT, J. In *Jewish Home for the Elderly of Fairfield County, Inc.,* v. *Cantore,* 257 Conn. 531, 532, 543–44, 778 A.2d 93 (2001) (*Jewish Home*), our Supreme Court recognized that a nursing home that has been harmed by the negligence of a conservator is entitled to recover, through an action on a probate bond, the losses it suffered as a result of the conservator's failure to timely file an application for Medicaid benefits on behalf of his or her ward. This appeal asks us to determine whether to recognize a similar right of recovery in a case where no probate bond was obtained.

This appeal arises out of an action by the plaintiff, Bloomfield Health Care Center of Connecticut, LLC, in which it alleged that the defendant, Jason Doyon, breached a duty to use reasonable care in managing the estate of his ward, Samuel Johnson. Specifically, the plaintiff argues that the defendant was negligent by failing to apply for and to obtain on a timely basis Medicaid benefits that were necessary to pay the plaintiff for the cost of Johnson's care at the plaintiff's nursing home. The plaintiff now appeals from the summary judgment rendered by the trial court in favor of the defendant. On appeal, the plaintiff claims that the court improperly concluded that the defendant did not owe it a duty of care and, thus, was entitled to judgment as a matter of law. We agree with the plaintiff and, accordingly, reverse the judgment of the court.

The record, viewed in the light most favorable to the plaintiff as the nonmoving party, reveals the following facts. The plaintiff operates a chronic care and convalescent nursing home facility in Bloomfield. On April 19, 2013, Johnson was admitted as a resident to the plaintiff's facility. Thereafter, the plaintiff provided care and services to Johnson at a rate of $360 per day. On October 1, 2013, the cost of care increased to $370 per day.

On September 26, 2013, Johnson's daughter, who at the time was acting as his attorney-in-fact, filed an application for Medicaid benefits on behalf of Johnson. On November 26, 2013, Johnson's daughter sold his home. The net proceeds from the sale of the home totaled $48,000.

On January 8, 2014, the Department of Social Services (department) denied Johnson's application for Medicaid benefits for failure to provide required information. The information missing from the application included the disposition of the proceeds from the sale of his home, copies of bank statements, information regarding the surrender of his stocks, and proof that his assets totaled less than $1600.

On February 26, 2014, the plaintiff petitioned the Probate Court to appoint an involuntary conservator to oversee Johnson's estate for the purpose of assisting

him with his finances and Medicaid application, and to ensure that it would be compensated for the necessary care it provided to him.[1] On April 8, 2014, the court adjudicated Johnson incapable of managing his financial affairs, granted the plaintiff's petition, and appointed the defendant as the conservator of Johnson's estate. The court dispensed with the requirement of a probate bond.

On April 15, 2014, the defendant tendered the $48,000 in proceeds from the sale of Johnson's home to the plaintiff to be applied to Johnson's outstanding bill, which totaled $124,000 at that time. After the proceeds from the sale of Johnson's home were paid to the plaintiff, his only other source of income was $1363 that he received in social security benefits each month, which the defendant subsequently began paying over to the plaintiff.

Although Johnson did not have sufficient remaining funds or income to pay for his care, it was not until nine months later, on January 21, 2015, that the defendant submitted Johnson's application for Medicaid benefits. On February 17, 2015, the department told the defendant that Johnson's application was incomplete and requested that the defendant provide it with additional information by February 28, 2015, including the value of any of Johnson's remaining real property and bank account statements. The defendant failed to provide the department with the requested information, and, on March 24, 2015, Johnson's application was denied.

The defendant filed Johnson's second application for Medicaid benefits on August 12, 2015. The application was granted on September 24, 2015, and Johnson's Medicaid benefits were made retroactive to May 1, 2015. Johnson did not receive any Medicaid benefits for the cost of his care prior to that date. On October 21, 2015, Johnson died.

On February 1, 2016, the plaintiff commenced the present action. The plaintiff alleged in the operative complaint that the defendant's failure to apply for and to obtain on a timely basis Medicaid benefits for Johnson had violated a duty of care that he owed to the plaintiff. The plaintiff further alleged that the defendant's negligence caused it to suffer financial harm and loss, and therefore it requested monetary damages.[2]

On July 19, 2016, the defendant filed an answer to the plaintiff's complaint and special defenses. On September 21, 2016, the defendant filed a motion for summary judgment. In his memorandum of law in support of his motion, the defendant argued that he did not owe a duty of care to the plaintiff. Specifically, he argued that he owed a duty of care only to Johnson, his ward, and thus the plaintiff did not have standing to bring the action. The defendant also argued that he was entitled to quasi-judicial immunity for his actions.

In its memorandum in opposition to the defendant's motion for summary judgment, the plaintiff argued that the defendant owed it a duty of care under a common-law theory of negligence. Specifically, the plaintiff argued that it was readily foreseeable that Johnson would be unable to pay it for the cost of his care if the defendant failed to timely submit a Medicaid application on his behalf and, further, that the plaintiff would suffer harm as a result. The plaintiff also argued that public policy supported its claim that the defendant owed it a duty of care and that there was "no principled reason why a conservator should avoid liability for his negligence simply because there is no probate bond in a particular case." Finally, the plaintiff argued that the defendant was not entitled to quasi-judicial immunity because the Probate Court never expressly approved the defendant's actions with respect to Johnson's Medicaid application.

On March 13, 2017, the court issued its memorandum of decision granting the defendant's motion for summary judgment, concluding that "the law does not support the plaintiff's claim that the defendant, solely as a result of his appointment as a conservator, owed any duty to the plaintiff." The court reasoned that "the defendant's duty, and, in fact, his authority to pursue Medicaid benefits on behalf of his ward, does not arise out of any relationship between the plaintiff and him, but solely from his appointment by the Probate Court as conservator, and his duties pursuant to that appointment." The court thus determined that the defendant did not owe the plaintiff a duty of care because "[t]he purpose of a conservator is not to manage the ward's estate for the benefit of his creditors but for the benefit of the ward." On March 31, 2017, the plaintiff timely filed the present appeal.

The plaintiff claims on appeal that the trial court improperly granted the defendant's motion for summary judgment because it incorrectly concluded that the defendant did not owe it a duty of care. Specifically, the plaintiff argues that the defendant owed it a duty to use reasonable care in managing Johnson's estate because (1) the harm caused to the plaintiff as a result of the defendant's negligence was foreseeable, and (2) public policy supports recognizing a duty of care in this context. We agree with the plaintiff that the defendant owed it a duty to use reasonable care to timely secure Medicaid benefits for Johnson.

We begin by setting forth the relevant standards that govern our review of a court's decision to grant a defendant's motion for summary judgment. "Practice Book § [17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a

motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under the applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. . . . [I]ssue-finding, rather than issue-determination, is key to the procedure. . . . Our review of the decision to grant a motion for summary judgment is plenary. . . . We therefore must decide whether the court's conclusions were legally and logically correct and find support in the record." (Internal quotation marks omitted.) *Barbee* v. *Sysco Connecticut*, LLC, 156 Conn. App. 813, 817–18, 114 A.3d 944 (2015).

We begin our analysis by first considering the defendant's role and general duties as conservator of Johnson's estate. General Statutes § 45a-655 sets forth the statutory duties of a conservator of an estate. Section 45a-655 (a) provides in relevant part: "A conservator of the estate appointed under section 45a-646, 45a-650, or 45a-654 shall, within two months after the date of the conservator's appointment, make and file in the Probate Court, an inventory, under penalty of false statement, of the estate of the conserved person, with the properties thereof appraised or caused to be appraised, by such conservator, at fair market value as of the date of the conservator's appointment. Such inventory shall include the value of the conserved person's interest in all property in which the conserved person has a legal or equitable present interest, including, but not limited to, the conserved person's interest in any joint bank accounts or other jointly held property. The conservator shall manage all the estate and apply so much of the net income thereof, and, if necessary, any part of the principal of the property, *which is required to support the conserved person* and those members of the conserved person's family whom the conserved person has a legal duty to support and *to pay the conserved person's debts*, and may sue for and collect all debts due the conserved person. . . ." (Emphasis added.)

Under certain circumstances, if a conservator is appointed to manage an individual's estate, a probate bond is issued. A probate bond is a "bond with security given to secure the faithful performance by an appointed fiduciary of the duties of the fiduciary's trust and the administration of and accounting for all moneys and other property coming into the fiduciary's hands, as fiduciary, according to law." General Statutes § 45a-139 (a). Every probate bond is "conditioned for the faithful performance by the principal in the bond of the duties of the principal's trust and administration of and accounting for all moneys and other property coming

into the principal's hands, as fiduciary, according to law . . . ." General Statutes § 45a-139 (b). If the assets of the ward's estate total twenty thousand dollars or more, the issuance of a probate bond is required. General Statutes § 45a-139 (c). A judge has discretion to waive the requirement of a probate bond if the assets of the estate total less than that amount, or under certain circumstances. See Probate Court Rules § 35.1 (b).

If a probate bond is issued and the conservator breaches his or her duties as fiduciary of the estate, a third party may bring an action on the bond to recover for the harm caused by the conservator's breach. In *Jewish Home*, our Supreme Court considered whether the plaintiff in that case, a nursing home facility, had "a right to bring an action on a probate bond when it suffer[ed] a loss as a result of a conservator's failure to ensure payment to the nursing home for his ward's care." *Jewish Home*, supra, 257 Conn. 532. J. Michael Cantore, Jr., had been appointed conservator of the person and estate of Diana Kosminer, a patient of the plaintiff nursing home. Id., 534. Cantore subsequently executed and filed with the Probate Court a probate bond in the amount of $50,000, which "was conditioned, as required by § 45a-139, on Cantore faithfully perform[ing] the duties of his trust and administer[ing] and account[ing] for all monies and other property coming into his hands, as fiduciary, according to law . . . ." (Internal quotation marks omitted.) Id., 534–35. Cantore, however, failed to use the assets of Kosminer's estate to pay the nursing home for her care or to timely secure Medicaid benefits for her, which resulted in an unpaid balance to the nursing home of $63,000. Id., 536.

The nursing home subsequently brought an action against Cantore on the probate bond, alleging that he had a duty, "as Kosminer's conservator, to use the assets of her estate to pay for the care and services she had received from the plaintiff." Id., 533–34, 536. The nursing home further alleged that Cantore had a duty to apply promptly for Medicaid assistance when the estate's assets approached the $1600 Medicaid eligibility mark. Id., 536. Cantore filed a motion to strike the nursing home's complaint for failure to state a legally sufficient cause of action. Id. The trial court granted Cantore's motion to strike, and this court affirmed the court's judgment. Id.

On appeal to our Supreme Court, the nursing home argued that "the law imposed certain duties upon Cantore, as conservator of Kosminer's estate and person; he breached those duties by failing to ensure timely payment to the plaintiff through either the estate or through public assistance; the breach of those duties constituted a breach of the probate bond; and the plaintiff was aggrieved by those breaches." Id., 537. Cantore argued, however, that the "[nursing home] had no authority to bring an action for the breach of the probate

bond because only parties acting as a representative of the estate or seeking recovery for the estate are entitled to bring such actions." Id.

In evaluating the plaintiff's claim, our Supreme Court first considered Cantore's duties as a conservator of the estate and conservator of the ward, respectively. Specifically, our Supreme Court noted that "[t]he statutory duties of a conservator are clearly defined in . . . § 45a-655, which delineates the duties of a conservator of the *estate*, and General Statutes § 45a-656, which prescribes the duties of a conservator of the *person*. A conservator of the estate shall manage all of the estate and apply so much of the net income thereof, and, if necessary, any part of the principal of the property, which is required to support the ward and those members of the ward's family whom he or she has the legal duty to support *and to pay the ward's debts* . . . . A conservator of the person has the duty to provide for the care, comfort, and maintenance of the ward . . . and the duty shall be carried out within the limitations of the resources available to the ward, either through his own estate or through private or public assistance. . . . In addition, where a statute imposes a duty and is silent as to when it is to be performed, a reasonable time is implied." (Citations omitted; emphasis in original; footnotes omitted; internal quotation marks omitted.) Id., 539–40.

Our Supreme Court then considered whether the complaint properly alleged a breach of Cantore's duties as conservator of Kosminer's estate and person. Id., 541. The complaint alleged that "Cantore failed to make timely payment to the plaintiff for the care and services it provided to Kosminer and failed to apply for [M]edicaid benefits on Kosminer's behalf once timely payment for the plaintiff's services had exhausted the assets of the estate. The complaint further alleged that these actions by Cantore resulted in a breach of his fiduciary duties as conservator of Kosminer's estate and person. Kosminer incurred a substantial debt as a result of the services she received from the [nursing home]. Cantore's failure to pay this debt, despite the estate's ample resources, constituted a breach of his duty under § 45a-655 (a) to use the assets of the estate to pay Kosminer's debts. Furthermore, Cantore's failure to ensure timely payment to the [nursing home] constituted a breach of his duty under § 45a-656 (a) to provide for Kosminer's care through the estate or through other private or public assistance." Id. Our Supreme Court concluded, therefore, that the nursing home had properly alleged facts that, if proven, would establish that Cantore failed to fulfill his duties as conservator of Kosminer's estate and person. Id.

Our Supreme Court then considered the categories of plaintiffs that can bring an action on a probate bond to recover loss suffered as a result of a conservator's

breach of his or her fiduciary duties pursuant to General Statutes (Rev. to 1995) § 45a-144. Id., 543. Specifically, our Supreme Court determined that the language of the statute "evince[d] the legislature's intent to create three separate categories of potential plaintiffs in a suit on a probate bond: first, a plaintiff bringing an action as representative of the estate; second, a plaintiff bringing an action in his own right; and third, a plaintiff bringing an action in the right of himself and all others having an interest in the estate . . . ." (Internal quotation marks omitted.) Id., 543. Our Supreme Court found that "[t]he [nursing home] fit squarely in the second category of potential plaintiffs authorized by § 45a-144 (a) to bring an action on the probate bond, namely, a plaintiff suing in its own right to recover in its own name for the breach of a probate bond," and concluded, therefore, that the complaint stated a legally sufficient cause of action. Id., 543–44.

In the present case, unlike in *Jewish Home*, no probate bond was issued. The plaintiff claims, nevertheless, that although it cannot bring an action against the defendant on a probate bond, it may still bring an action against the defendant under a common-law theory of negligence because the defendant in the present case, like Cantore, owed it a duty to use reasonable care to apply for and to obtain Medicaid benefits for Johnson and had breached that duty. The plaintiff argues that "the absence of a probate bond . . . is not and should not be determinative of a [c]onservator's liability for his negligent actions under the common law" when the "establishment of a bond is predicated upon the amount of assets" in the estate.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." (Internal quotation marks omitted.) *Jarmie* v. *Troncale*, 306 Conn. 578, 589, 50 A.3d 802 (2012). "Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual. . . . Although it has been said that no universal test for [duty] ever has been formulated . . . our threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised. . . . [T]he test for the existence of a legal duty entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate the harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibilities for its negligent conduct should extend to the particular

consequences *or particular plaintiff in the case.*"
(Emphasis added; internal quotation marks omitted.)
*Munn* v. *Hotchkiss School,* 326 Conn. 540, 548, 165 A.3d
1167 (2017). "[T]he determination of whether a duty
exists . . . is a question of law." (Internal quotation
marks omitted.) *Lodge* v. *Arrett Sales Corp.*, 246 Conn.
563, 571, 717 A.2d 215 (1998).

It is important, before conducting a duty analysis, to
note that the common law is not static but dynamic,
and often evolves to adapt to the changing conditions
of society. See *Goodrich* v. *Waterbury Republican-
American, Inc.*, 188 Conn. 107, 127, 448 A.2d 1317
(1982) (recognizing for first time action for invasion of
privacy in Connecticut). Thus, when a plaintiff can show
that the two requirements for the test of the existence
of a legal duty of care have been met, our courts may
recognize that the plaintiff can bring an action for negli-
gence against the defendant. See *Munn* v. *Hotchkiss
School*, supra, 326 Conn. 548–60 (recognizing that
school had legal duty to warn students about or protect
students against risk of serious insect-borne disease
when organizing trip abroad); *Monk* v. *Temple George
Associates, LLC*, 273 Conn. 108, 114–22, 869 A.2d 179
(2005) (parking lot owner owed reasonable duty to ade-
quately light and monitor parking lot to nightclub patron
who parked there).

## I

## FORESEEABILITY

The plaintiff argues that it was readily foreseeable
that, if the defendant failed to timely obtain Medicaid
benefits for Johnson, the plaintiff would suffer harm
as a result because it would not be reimbursed for the
cost of Johnson's care. The plaintiff contends that the
entire purpose of its petition to the Probate Court was
to assure access to Medicaid benefits for Johnson and
that the defendant knew that Johnson did not have
enough assets to pay for his care and was incurring
debt to it at a rate of $370 per day. The plaintiff also
contends that the defendant was the only person who
had control over Johnson's estate and, consequently,
the authority to obtain Medicaid benefits for him.

The defendant argues, however, that the harm suf-
fered by the plaintiff was not foreseeable because the
defendant's only fiduciary responsibilities were to John-
son and not his creditors. Specifically, the defendant
argues that he "could not have foreseen any harm to the
[p]laintiff because [he] did not enter into any agreement,
contract, or relationship with the [p]laintiff regarding
[Johnson's] eligibility for [Medicaid] benefits." The
defendant also disagrees with the plaintiff's assertion
that the purpose of its petition to the Probate Court
was to have a conservator appointed to help Johnson
obtain Medicaid benefits.

"[F]oreseeability that harm may result if [a duty of

care] is not exercised . . . is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable, but the test is, would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result . . . ." *Jarmie* v. *Troncale*, supra, 306 Conn. 590. Ordinarily, "whether the injury is reasonably foreseeable . . . gives rise to a question of fact for the finder of fact . . . . foreseeability becomes a conclusion of law only when the mind of a fair and reasonable [person] could reach only one conclusion; if there is room for reasonable disagreement the question is one to be determined by the trier as a matter of fact." (Citation omitted; internal quotation marks omitted.) *Ruiz* v. *Victory Properties, LLC*, 315 Conn. 320, 330, 107 A.3d 381 (2015).

We conclude that the harm suffered by the plaintiff in the present case was foreseeable as a matter of law. The plaintiff petitioned the Probate Court to appoint an involuntary conservator to Johnson to help him manage his estate and noted in its petition that Johnson needed help completing a Medicaid application. Once appointed as Johnson's conservator, the defendant alone had access and control over Johnson's assets, income and property.

Furthermore, it is undisputed that, when the defendant was appointed as conservator of Johnson's estate, Johnson already had accrued several thousands of dollars of debt to the plaintiff. It is also undisputed that, even though the defendant tendered the $48,000 in proceeds from the sale of Johnson's house to the plaintiff and began paying over his social security checks, Johnson still was unable to pay the $370 per day required to cover the cost of his care and, therefore, continued to accrue debt to the plaintiff. Having disposed of Johnson's assets and being familiar with his finances, the defendant would have been acutely aware of these facts and that his failure to obtain Medicaid benefits for Johnson would result in Johnson being unable to pay for the necessary care rendered to him by the plaintiff.

The defendant argues that the harm to the plaintiff was not foreseeable because the defendant was not in privity with the plaintiff. Our Supreme Court has determined, however, that a defendant may owe a duty of care to third parties under certain circumstances. See *Gazo* v. *Stamford*, 255 Conn. 245, 249–51, 765 A.2d 505 (2001) (defendant who contracted with Chase Bank to remove snow from sidewalk in front of building owed duty to third-party plaintiff who was injured as result of defendant's failure to properly remove snow and ice; relationship between defendant's alleged negligence and plaintiff's injury was direct and well within scope of foreseeability); *Lombard* v. *Edward J. Peters, Jr.*,

*P.C.*, 252 Conn. 623, 632–33, 749 A.2d 630 (2000) (defendant, acting as committee for foreclosure sale, owed plaintiff condominium owners duty to use reasonable care to properly identify property included in foreclosure sale; plaintiffs could properly maintain negligence action against defendant for misidentifying their garage as part of foreclosure property); *Coburn* v. *Lenox Homes, Inc.*, 173 Conn. 567, 574, 378 A.2d 599 (1977) (privity not required to bring negligence action; subsequent purchasers of home could bring negligence action against corporation that constructed it). Thus, the plaintiff need not show that it was in privity with the defendant for us to determine that the harm suffered by the plaintiff was foreseeable.

Rather, what is important is whether an ordinary person, standing in the shoes of the defendant, would or should have known that the harm of the general nature suffered by the plaintiff was likely to result. See *Lombard* v. *Edward J. Peters, Jr., P.C.*, supra, 252 Conn. 633. Thus, considering that (1) the plaintiff petitioned the Probate Court to have a conservator appointed, (2) the petition specifically alleged that Johnson needed assistance completing his Medicaid application, (3) the defendant knew of Johnson's growing debt to the plaintiff and that Johnson could not pay the plaintiff for the cost of his care, and (4) the defendant had the exclusive authority to access and manage Johnson's finances, we conclude, as a matter of law, that the harm to the plaintiff was foreseeable.

## II

### PUBLIC POLOCY

In light of our conclusion that the harm suffered by the plaintiff was reasonably foreseeable as a matter of law, we next turn to consider whether public policy supports recognizing that the defendant owed to the plaintiff a duty to use care in the administration and management of Johnson's estate, which included timely completing Johnson's application for Medicaid benefits. Indeed, "[a] simple conclusion that the harm to the plaintiff was foreseeable . . . cannot by itself mandate a determination that a legal duty exists. Many harms are quite literally foreseeable, yet for pragmatic reasons, no recovery is allowed. . . . A further inquiry must be made, for we recognize that duty is not sacrosanct in itself . . . but is only an expression of the sum total of those considerations of policy [that] lead the law to say that the plaintiff is entitled to protection. . . . The final step in the duty inquiry, then, is to make a determination of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results." (Internal quotation marks omitted.) *Munn* v. *Hotchkiss School*, supra, 326 Conn. 549–50.

"[I]n considering whether public policy suggests the imposition of a duty, we . . . consider the following

four factors: (1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions." (Internal quotation marks omitted.) Id., 550. "[This] totality of the circumstances rule . . . is most consistent with the public policy goals of our legal system, as well as the general tenor of our [tort] jurisprudence." (Internal quotation marks omitted.) *Ruiz* v. *Victory Properties, LLC*, supra, 315 Conn. 337. We also note the three fundamental purposes of our tort compensation system, which are the "compensation of innocent parties, shifting the loss to responsible parties or distributing it among appropriate entities, and deterrence of wrongful conduct . . . ." (Internal quotation marks omitted.) *Lodge* v. *Arett Sales Corp.*, supra, 246 Conn. 578–79.

A

We begin by considering the normal expectations of the participants in the activity under review. The plaintiff argues that, although it "certainly did not expect to recover the debt which accrued prior to [the defendant's] appointment, [it] did expect that funds were going to be provided and made available for . . . Johnson's care, and [that the defendant] would obtain funds for his support by way of the Medicaid program" because it "set out to [have] appoint[ed] a conservator for that purpose."

Before we begin our analysis, we note that our statutes themselves are a source of public policy, and may militate in favor of recognizing a common-law duty of care when doing so advances the general policies and objectives of the statute. See *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 580–82, 657 A.2d 212 (1995). Thus, in determining the normal expectations of the parties, our appellate courts have often looked to "Connecticut's existing body of common law and statutory law relating to th[e] issue. See, e.g., [*Ruiz* v. *Victory Properties*, supra, 315 Conn. 337–38] (considering existing common-law principles and statutory requirements in determining whether apartment building landlord owed duty to keep yard clear of debris that could be thrown by children); *Greenwald* v. *Van Handel*, 311 Conn. 370, 376–77, 88 A.3d 467 (2014) (noting [our Supreme Court's] recognition in equity and contractual contexts of certain 'common-law maxims' before considering whether to extend them to professional negligence claim against therapist arising from plaintiff's arrest for possession of child pornography); *Jarmie* v. *Troncale*, supra, 306 Conn. 603–605 (reviewing Connecticut medical malpractice case law and statutes governing health-care providers in determining whether physician owed plaintiff, who was injured in automobile accident with physician's patient,

common-law duty to inform patient of driving risks associated with her medical condition).” *Lawrence* v. *O & G Industries, Inc.*, 319 Conn. 641, 651, 126 A.3d 569 (2015).

In considering whether the plaintiff reasonably could have expected that the defendant would have obtained available funds for the cost of Johnson’s care, then, we first look to the statutory duties of a conservator of an estate, which are outlined in § 45a-655 (a). Section 45a-655 (a) provides that the defendant had a statutory duty to use Johnson’s estate to support him as well as pay his debts, which, in Johnson’s case, included his significant and growing debt to the plaintiff. Moreover, § 45a-655 (d) provides, in relevant part, that, “[i]n the case of any person receiving public assistance, state-administered general assistance or Medicaid, the conservator of the estate shall apply toward the cost of care such person any assets exceeding limits on assets set by statute or regulation adopted by the Commissioner of Social Services. . . .”

In the present case, Johnson did not have enough assets in his estate to pay the plaintiff for the cost of his care. Because Johnson was unable to pay for his care, the only way that the defendant could use Johnson’s estate to support him and to pay his debt to the plaintiff would be to spend down Johnson’s remaining assets such that he was eligible for Medicaid and, thereafter, timely complete Johnson’s application for Medicaid benefits. See *Ross* v. *Giardi*, 237 Conn. 550, 555–74, 680 A.3d 113 (1996) (discussing applicability of resource spend down methodology to Medicaid benefits). The defendant clearly had the authority, pursuant to statute, to take such actions. Section 45a-655 (a) grants the conservator of the estate access to the ward’s assets and financial records and the authority to manage his estate. Furthermore, § 45a-655 (d) contemplates that the conservator of the ward’s estate will assist the ward in qualifying for Medicaid benefits, specifically. It is a logical extension of the plain language of the statute, then, to conclude that the parties could expect that the defendant would timely submit Johnson’s application for Medicaid benefits in the event that he was unable to pay the plaintiff for the cost of his care.

In addition to the statutory duties of a conservator of an estate outlined in § 45a-655 (a), the Connecticut Standards of Practice for Conservators (2018), standard 17 I explicitly provides, in relevant part, that “[w]ith the proper authority and within the resources available to the conserved person, the conservator of the estate shall have the following duties . . . E. *The conservator shall seek public and insurance benefits that are beneficial for the conserved person.* . . .”[3] (Emphasis added.) Standard 17 I E suggests that it is widely understood by conservators in Connecticut that they are able to—and, in fact, have a duty to—seek public assistance

for their ward when necessary.

Moreover, we also find compelling in evaluating the normal expectation of the parties the fact that the plaintiff's petition for involuntary conservatorship specifically noted that Johnson needed help completing his application for Medicaid benefits. This allegation put the defendant on notice that (1) one of the purposes of his appointment was to help Johnson obtain Medicaid benefits, and (2) the plaintiff, specifically, would incur loss if the defendant failed to do so.

It is reasonable, then, considering the defendant's statutory duties under § 45a-655 (a) and the authority granted in him thereunder, as well as the fact that the plaintiff's petition for a conservator specifically mentioned that Johnson needed help obtaining Medicaid benefits, that the plaintiff would have expected the defendant, as conservator of Johnson's estate, to take steps necessary to pay the portion of Johnson's debt to the plaintiff that accrued after he was appointed and to secure any available public funding that would help pay for the cost of his care. See *Jewish Home*, supra, 257 Conn. 540–42 (plaintiff nursing home correctly expected that conservator of patient's estate and person would timely secure payment for cost of patient's care considering conservator's statutory duties);[4] see also *Jarmie* v. *Troncale*, supra, 306 Conn. 604 (plaintiff could not expect that physician owed general public duty to warn patient that her condition might affect her ability to drive because no statute or regulation imposed such duty).

The defendant argues, however, that in the event that he failed to timely submit Johnson's application for Medicaid benefits, he could not have expected that he would be held personally liable to the plaintiff for his failure to do so. Rather, he contends that, because there was no direct relationship between the plaintiff and the defendant,[5] it was the normal expectation of the parties "that any claim by the [p]laintiff . . . for money owed by the ward for the [p]laintiff's services would be brought against the ward's estate and not the [d]efendant." We disagree with the defendant.

At the outset, we note that there is a fundamental inconsistency in applying the defendant's argument to our inquiry regarding the normal expectations of the parties. The sole issue in this case is whether the defendant owed the plaintiff a duty to use reasonable care in timely securing public assistance to pay for the services rendered to Johnson by the plaintiff. If we do agree with the plaintiff that the defendant owed it a duty of care and, therefore, that it properly could bring a negligence action against him, it would be the first time that this notion was expressly recognized by either of our appellate courts.

Because of this, our inquiry regarding the normal

expectations of the parties cannot begin and end with the question of whether our appellate courts have considered previously the legal viability of this exact action. To conclude as such would render our inquiry pointless, as we only consider the normal expectations of the parties when we ask for the first time whether the defendant in a particular case owed the plaintiff a duty of care. Presumably, then, every time a plaintiff brought a negligence action against a defendant alleging breach of a duty that has not been explicitly recognized by our appellate courts, the defendant could simply make an argument that it was not the normal expectation of the parties that the defendant could be held personally liable to the plaintiff for his or her negligence. We must focus, instead, not on whether the defendant could have expected that the plaintiff could bring a negligence action against him, specifically, but on the broader inquiry of whether the defendant could have expected that he would be held liable to a nursing home, in some way, for the type of misconduct alleged in the present case.

Our Supreme Court's decision in *Jewish Home*, supra, 257 Conn. 531 is instructive on this point. Our Supreme Court concluded in that case that a conservator could be held liable to a nursing home, specifically, for the losses it incurred as a result of the conservator's failure to timely secure Medicaid benefits for his ward. Id., 539–44. It is true that the nursing home in *Jewish Home* brought an action on a probate bond, rather than an action in negligence. What is significant for the purpose of our analysis, however, is that our Supreme Court recognized that a conservator could be held liable (1) to a nursing home, and (2) for the exact type of misconduct alleged in the present case.

The fact that the plaintiff in the present case and the plaintiff in *Jewish Home* are both nursing homes is significant because nursing homes are unique and differ from other creditors of an estate. This difference is primarily due to the critical nature of the services they provide to the ward—namely, shelter, food, and care to a vulnerable segment of our population.

Moreover, nursing homes are also unique because, unlike other service providers, they are very limited in their ability to refuse to provide or discontinue service to individuals who are indigent. Indeed, Connecticut by statute has imposed strict rules that govern the circumstances under which a nursing home[6] can (1) refuse to admit an indigent patient, or (2) involuntarily discharge a patient. General Statutes § 19a-533 (b) provides in relevant part: "A nursing home which receives payment from the state for rendering care to indigent persons shall: (1) *Be prohibited from discriminating against indigent persons who apply for admission to such facility on the basis of source of payment.* Except as otherwise provided by law, all applicants for admission

to such facility shall be admitted in the order in which such applicants apply for admission. . . ." (Emphasis added.) Subsection (b) (3) of § 19a-533 further prohibits nursing homes from "requiring that an indigent person pay any sum of money or furnish any other consideration, including but not limited to the furnishing of an agreement by the relative, conservator or other responsible party of an indigent person which obligates such party to pay for care rendered to an indigent person as a condition for admission of such indigent person . . . ."

General Statutes § 19a-535 governs the circumstances under which a nursing home may involuntarily discharge a patient. Section 19a-535 (b) provides, in relevant part, that "[a] facility shall not transfer or discharge a resident from the facility except to meet the welfare of the resident which cannot be met in the facility, or unless the resident no longer needs the services of the facility due to improved health, the facility is required to transfer the resident pursuant to section 17b-359 or 17b-360, or the health or safety of individuals in the facility is endangered, or *in the case of a self-pay resident*, for the resident's nonpayment or arrearage of more than fifteen days of the facility room rate, or the facility ceases to operate. . . ." (Emphasis added.) Section 19a-535 (a) (5) provides, in relevant part, that a "self-pay resident means *a resident who is not receiving state or municipal assistance to pay for the cost of care at a facility*, but shall not include a resident who has filed an application with the Department of Social Services for Medicaid coverage for facility care but has not received an eligibility determination from the department on such application, provided that the resident has timely responded to requests by the department for information that is necessary to make such determination . . . ." (Emphasis added; internal quotation marks omitted.)

Thus, pursuant to §§ 19a-533 and 19a-535, a nursing home may not refuse to admit a patient simply because he or she is indigent, nor may a nursing home discharge a patient who is reliant on Medicaid or in the process of obtaining Medicaid benefits but otherwise unable to pay for the cost of his or her care. In other words, the nursing home's hands are metaphorically tied—in the case that a patient is indigent and unable to pay for the cost of care, the nursing home itself cannot apply on behalf of the patient for public assistance yet must continue to provide services to the patient at its own expense. This predicament highlights just how critical it is to the nursing home that a conservator, once appointed, performs his or her duties in a timely and attentive fashion.[7]

Moreover, with respect to the defendant's argument that he could not expect that he would be held liable for the plaintiff's loss because no probate bond was issued, we reiterate that the type of misconduct alleged

by the plaintiff against the defendant in the present case is almost identical to that complained of by the plaintiff in *Jewish Home*, supra, 257 Conn. 535, 543–44. Our Supreme Court concluded in *Jewish Home* that the plaintiff nursing home could maintain an action on a probate bond against a conservator for his failure to timely complete an application for Medicaid benefits on behalf of his ward. Id., 540–44. Thus, the defendant should have at least been on notice that his failure to submit timely Johnson's application for Medicaid benefits could give rise to some sort of liability. Indeed, it would be unreasonable for the defendant to believe that the plaintiff would be left without a remedy simply because no probate bond was obtained.

Finally, the defendant argues that the parties could not have expected that he would be held personally liable to the plaintiff for his failure to timely submit Johnson's application for Medicaid benefits because he was acting as an agent of the Probate Court and thus is entitled to quasi-judicial immunity. A conservator is entitled to quasi-judicial immunity, however, only when his or her actions are expressly authorized or approved by the Probate Court. See *Gross* v. *Rell*, 304 Conn. 234, 251–52, 40 A.3d 240 (2012).

"[W]hen the Probate Court has expressly authorized or approved specific conduct by the conservator, the conservator is not acting on behalf of the conservatee, but as an agent of the Probate Court." *Gross* v. *Rell*, supra, 304 Conn. 251. Thus, "when the conservator has obtained the authorization or approval of the Probate Court for his or her actions on behalf of the conservatee's estate, the conservator cannot be held personally liable." Id., 251–52.

In cases where "the conservator's acts are not authorized or approved by the Probate Court, however . . . [there is] no reason to depart from the common-law rule that the conservator of the estate is not acting as the agent of that court, but as the fiduciary of the conservatee, and, as such, may be held personally liable." Id., 253–54. "A conservator is a fiduciary and acts at his peril and on his own personal responsibility *unless and until* his actions in the management of the ward's estate are approved by the Probate Court." (Emphasis added; internal quotation marks omitted.) *Zanoni* v. *Hudon*, 48 Conn. App. 32, 37, 708 A.2d 222, cert. denied, 244 Conn. 928, 711 A.2d 730 (1998); see also *Elmendorf* v. *Poprocki*, 155 Conn. 115, 120, 230 A.2d 1 (1967) ("[e]ven if it was proper and necessary for the conservatrix to utilize the plainitiff's services in the management of her ward's estate, the liability for the value of the services rested on her personally, until they were subsequently approved by the Probate Court").

The defendant has failed to show that any of his actions with respect to his failure to obtain Medicaid

benefits for Johnson were specifically ratified by the Probate Court. In other words, the defendant has not directed our attention to any order of the Probate Court that excused his obligation to timely submit Johnson's application for Medicaid benefits. Rather, in support of his argument that he is entitled to quasi-judicial immunity, the defendant simply makes the conclusory legal assertion that "[i]t was the expectation of the parties that [he] was acting with quasi-judicial immunity as he was performing his duties pursuant to his Probate Court appointment as conservator." Because our case law provides that a conservator is entitled to quasi-judicial immunity only if the specific act or acts at issue were approved by the court, the defendant's failure to show that even one act of his was ratified by the court is fatal to his argument. See *Gross* v. *Rell*, supra, 304 Conn. 256–57 (rejecting claims that conservators are entitled to quasi-judicial immunity even when acts are not authorized or approved by Probate Court simply because statutory safeguards exist to ensure proper behavior by conservator and that conservators, like guardian ad litems, are entitled to quasi-judicial immunity for discretionary acts); see also *Elmendorf* v. *Poprocki*, supra, 155 Conn. 119 (conservator was powerless to sell ward's estate without prior express authorization of Probate Court); compare *Zanoni* v. *Hudon*, supra, 48 Conn. App. 36–37 (conservator was not individually liable for breach of contract because Probate Court approved contract of sale and conservator, therefore, was acting as agent of Probate Court).

We conclude, therefore, that the parties reasonably could have expected that the defendant (1) would take the steps necessary to secure payment for the cost of Johnson's care, which necessarily included timely completing Johnson's application for Medicaid benefits, and (2) could be held liable to the plaintiff if he failed to do so. The first factor of the public policy prong of our duty analysis therefore weighs heavily in support of the plaintiff's claim that the defendant owed it a duty of care.

B

Next, because they are analytically related, we consider together the second and third factors, namely, the public policy of encouraging participation in the activity, while weighing the safety of the participants,[8] and the avoidance of increased litigation. See *Lawrence* v. *O & G Industries, Inc.*, supra, 319 Conn. 658. With respect to these two factors, the plaintiff argues that, if we decline to recognize that a conservator can be held personally liable to it for his or her breach of statutory duties, it would lessen any incentive on conservators to perform their duties efficiently and adequately, and thus undermine the purpose of allowing nursing homes to petition to have a conservator appointed in the first place. The plaintiff further argues

that, with respect to the consideration of increased litigation, any concern that recognizing a duty in this context would increase significantly a conservator's exposure is misplaced because a conservator already has certain statutory duties that require him or her to timely secure funding for the ward's care. The defendant argues, however, that recognizing a duty in this context would chill, rather than encourage, individuals to take on the role of conservator because it would increase a conservator's liability.

We recognize that, with respect to the third factor which contemplates the concern of increased litigation, "[i]t is [often] easy to fathom how affirmatively imposing a duty on the defendants . . . could encourage similarly situated future plaintiffs to litigate on the same grounds; that is true *anytime* a court establishes a potential ground for recovery." (Emphasis in original.) *Monk* v. *Temple George Associates*, LLC, supra, 273 Conn. 120. Because of this, in considering these two factors, our Supreme Court at times has employed a balancing test to determine whether, in the event that a duty of care is recognized by the court, the advantages of encouraging participation in the activity under review outweigh the disadvantages of the potential increase in litigation. See id., 119–120 (concluding that desirability of promoting local business if duty was recognized outweighed relatively small potential increase in litigation); see also *Lawrence* v. *O & G Industries, Inc.*, supra, 319 Conn. 658–61 (concluding that recognition of duty would cause increase in litigation with no corresponding increase in safety on industrial and construction work sites.); *Jarmie* v. *Troncale*, supra, 306 Conn. 613–14 ("expanding the duty of a health care provider to an unforeseen victim of a patient's unsafe driving [w]ould interfere significantly with a health care provider's discretion to treat and counsel patients in accordance with an assessment of the patient's individual needs," while inevitably increasing number of actions against health care providers). Thus, the relevant inquiry in the present case is whether recognizing a duty in this context would further encourage conservators to use reasonable care in their administration of the ward's estate and, if so, whether the advantages of encouraging such behavior would outweigh the negative effects of a corresponding increase in litigation.

Our statutory scheme—or lack thereof—with respect to conservator liability has created a liability "loophole." Conservators are able to escape liability in cases in which no probate bond is issued even if they act negligently in carrying out their duties.[9] As discussed in part II A of this opinion, § 45a-655 (a) imposes certain statutory duties on conservators. Interestingly enough, however, our statutes do not provide any corresponding statutory cause of action to third parties who are harmed by a conservator's negligent failure to perform his or her duties when no probate bond is issued. Thus,

it is likely that recognizing that a conservator can be held liable for his or her negligence even without a probate bond would incentivize conservators to carry out their duties in a timely manner and with due care, whereas someone else who is already exposed to this type of liability would not be so incentivized. See *Lawrence* v. *O & G Industries, Inc.,* supra, 319 Conn. 659 ("[W]e observe that expanding the defendants' liability in this industrial accident context to include the purely economic damages suffered by other workers on site appears likely to increase the pool of potential claimants greatly. At the same time, the recognition of such a duty fails to provide a corresponding increase in safety, given that companies like the defendants are subject to extensive state and federal regulation, and already may be held civilly liable to a wide variety of parties who may suffer personal injury or property damage as a result of their negligence in the industrial or construction context." [Footnote omitted.]).

Furthermore, we do not agree with the defendant that allowing the plaintiff to bring a negligence action against him would discourage individuals from accepting the role of conservator of the estate. As we discussed in part II A of this opinion, the conservator of the estate already has a duty to pay their ward's debt and to use the assets of the estate to support the ward, which necessarily includes timely securing any available public assistance if the ward lives in a nursing home and is unable to pay for the cost of his or her care. See General Statutes § 45a-655 (a); *Jewish Home,* supra, 257 Conn. 538–44; Office of the Probate Court Administrator, Connecticut Standards of Practice for Conservators (2018), standard 17 I E, available at http://www.ctprobate.gov/Documents/Connecticut%20 Standards%20of20Practice%20for%20Conservators.pdf (last visited October 3, 2018). We are therefore not imposing any additional duties on the conservator of the estate that he or she is not already required to perform. See *Gazo* v. *Stamford,* supra, 255 Conn. 254 (rejecting snow removal company's public policy argument that recognizing duty to third parties "would be too burdensome because independent contractors would be liable to innumerable third parties, thereby creating a disincentive to contractors from doing this kind of business" and concluding that "[a]lthough we agree that contractors may be liable to parties whom they could not have necessarily identified specifically when entering into the original contract, they always have had a duty to perform their work in a nonnegligent manner, and our conclusion does no more than to hold contractors liable to those parties foreseeably injured by their negligence").

The defendant also argues that recognizing a duty in this context would increase litigation. Although we agree that recognizing such a duty would expose conservators to a new *type* of liability, we conclude that

any corresponding increase in litigation would be minimal and not enough to outweigh the advantages of encouraging conservators to perform their obligations with due care. First, there likely would be no need to bring an action against a conservator in his or her personal capacity in cases where a probate bond was issued because, in those cases, an action could be brought on the bond. Second, the nature of the relationship between a conservator and a nursing home is not normally contentious or fertile ground for litigation in the first instance. See *Gross* v. *Rell*, supra, 304 Conn. 258 (Our Supreme Court considered whether conservators, like guardians ad litem, should be entitled to quasi-judicial immunity for discretionary acts and concluded: "The role of a guardian ad litem for children in the inherently hostile setting of a marital dissolution proceeding . . . is distinguishable . . . from the role of a court-appointed conservator. It is all but inevitable that, in a dissolution proceeding, at least one of the parties will be disgruntled by the guardian ad litem's conduct towards the children and his or her recommendations concerning their best interests. Accordingly, without immunity, the guardians would act like litigation lightning rods. . . . In contrast, *it is not all but inevitable that conservators will act as litigation lighting rods for third party claims* because there is no such inherent conflict between the conservatee's interests and the interests of others." [Citation omitted; emphasis added; internal quotation marks omitted.]).

Finally, with respect to the "safety" of the participants of the activity, we find it particularly worrisome that, if we decline to recognize that the defendant owed the plaintiff a duty in the present case, the plaintiff and other nursing homes similarly situated will be left without a remedy that would allow them to recover losses sustained as a result of a conservator's negligence in cases where no probate bond is issued. The defendant argues that the plaintiff could have (1) requested the issuance of the probate bond itself, or (2) pursued a claim directly against Johnson's estate. We disagree with the defendant that the pursuit of either of these alternatives would suffice to make the plaintiff whole.

We find the defendant's suggestion that the nursing home that houses the ward, rather than the conservator of that ward's estate, should be required to ask the court to issue a probate bond to be unfair and unrealistic, as it would require a nursing home to monitor probate proceedings to ensure that a probate bond has been issued for each of its patients for which a conservator has been appointed. Imposing this obligation seems unnecessary considering that the issuance of a probate bond is already mandated by statute in certain circumstances. See General Statutes § 45a-139 (c); see also Probate Court Rules § 35.1 (b). Moreover, this potential avenue of recovery exists only if a nursing home acts

preemptively on an assumption that a conservator will act negligently which, once again, seems unnecessary considering that a conservator already has certain statutory duties that require the conservator to pay the ward's debts and to use the estate to support the ward. See General Statutes § 45a-655 (a).

Pursuing a direct claim against a ward's estate would likewise be a fruitless endeavor for the plaintiff and other similarly situated nursing homes that encounter this issue because, typically, the ward's estate is insolvent. To obtain Medicaid benefits, an applicant must have less than $1600 in assets. Furthermore, because the cost of care at a nursing home is so expensive, even those individuals that have a considerable amount of assets in their estate likely will not be able to pay for the long-term costs of care. In those instances, the conservator should "spend down" the ward's assets so that the ward becomes eligible to receive Medicaid benefits, meaning that the ward's estate becomes insolvent for all practical purposes. See *Ross* v. *Giardi*, supra, 237 Conn. 555–74. Therefore, pursuing a third-party claim against the estate would often be fruitless.

Having considered all the relevant concerns of the parties, we conclude that the benefits of encouraging conservators to carry out their duties with care and preventing financial harm outweigh any corresponding minimal increase in litigation. Thus, the second and third factors support the plaintiff's claim that the defendant owed it a duty of care.

C

The fourth and final factor that we consider in conducting our public policy analysis is the law of other jurisdictions on this issue. See *Jarmie* v. *Troncale*, supra, 306 Conn. 615. The plaintiff and the defendant both agree, and our independent research confirms, that no other reported decisions from other jurisdictions have decided the exact issue in this case, i.e., whether a conservator can be held personally liable to a nursing home facility or other third-party creditor, under a common-law theory of negligence, for failure to use care in performing his or her duties.

Several of our sister states, however, have enacted legislation that allows a third party to bring a *statutory* cause of action against a conservator if the conservator commits a tort in the course of the administration of the estate or the conservator otherwise is personally at fault for the party's loss. See Ala. Code § 26-2A-157 (b) (1975) ("[t]he conservator is personally liable for obligations arising from ownership or control of property of the estate or for torts committed in the course of administration of the estate if personally at fault"); Ariz. Rev. Stat. Ann. (1997) § 14-5429 (B) (same); Colo. Rev. Stat. § 15-1.5-112 (2) (b) (1999) (custodial trustee liable to third parties for obligations arising from con-

trol of custodial trust property or for tort committed in course of administration of custodial trust where custodial trustee is personally at fault); D.C. Code § 21-2074 (b) (2001) ("[t]he conservator is personally liable for obligations arising from ownership or control of property of the estate or for torts committed in the course of administration of the estate . . . if personally at fault"); Haw. Rev. Stat. § 560:5-430 (b) (2004) (same); Idaho Code Ann. § 68-1312 (2) (b) (1989); Mass. Gen. Laws ch. 190b, § 5-428 (b) (2009) (conservator can be held personally liable if personally at fault for obligations arising from ownership or control of property of estate or torts committed in course of administration of estate); Minn. Stat. § 524.5-430 (b) (2003); Mo. Rev. Stat. § 475.132 (2) (1983); N.J. Stat. Ann. § 3b:13A-29 (1983); N.C. Gen. Stat. § 33B-12 (b) (2) (1995); S.C. Code Ann. § 62-5-429 (b) (1976); W. Va. Code § 44A-3-14 (c) (2000).

The recognition by so many of our sister states of this statutory cause of action is significant with respect to our public policy analysis. Statutes do not exist in a vacuum, and "it is well established that statutes are a useful source of policy for common-law adjudication, particularly when there is a close relationship between the statutory and common-law subject matters." (Internal quotation marks omitted.) *Hopkins* v. *O'Connor*, 282 Conn. 821, 844, 925 A.2d 1030 (2007) (recognizing need for consistency between statutory scheme and common law and declining to extend common-law absolute immunity to officer's actions where statute imposed criminal liability for same actions); see also *DeMaria* v. *DeMaria*, 247 Conn. 715, 721, 724 A.2d 1088 (1999) (considering statutory definition of "cohabitation" in determining meaning of that term as used in dissolution judgment; statute was useful source of common-law policy and could be used as definitional source); *Williams Ford, Inc.* v. *Hartford Courant Co.*, supra, 232 Conn. 580–82 (concluding that policy underlying statute should apply to negligent misrepresentation as matter of common law). Indeed, statutes "are now central to the law in the courts, and judicial lawmaking must take statutes into account virtually all of the time . . . ." (Internal quotation marks omitted.) *Hopkins* v. *O'Connor*, supra, 845. We can therefore glean from the fact that so many of our sister states have recognized this statutory cause of action that the legislatures of those states believed that third parties should have a right to recover for harm caused to them by a conservator's negligence.

The defendant argues that the fact that no other states have considered whether a third party can bring an action against a conservator under a common-law theory of negligence weighs against recognizing that the defendant owed the plaintiff a duty of care. The fact that those states allow a third party to bring a statutory, rather than a common-law, cause of action is of no

consequence to our consideration of whether public policy favors recognizing a duty of care. Instead, the relevant observation for purposes of the present analysis is that other jurisdictions recognize that principles of fairness weigh in favor of providing a third party with a remedy in the event that a conservator acts negligently and, as a result of that negligence, causes a third party to suffer harm. The fourth prong of our public policy analysis therefore also supports the plaintiff's claim that the defendant owed it a duty of care in the present case.

### III

### CONCLUSION

We therefore conclude, having considered whether the harm suffered by the plaintiff was foreseeable and all relevant public policy concerns, that the defendant owed the plaintiff a duty to use reasonable care in performing his duties as conservator of Johnson's estate, which necessarily included timely submitting Johnson's application for Medicaid benefits in order to obtain available public assistance funds for the cost of Johnson's necessary and critical care provided by the plaintiff.

The judgment is reversed and the case is remanded for further proceedings in accordance with this opinion.

In this opinion the other judges concurred.

[1] General Statutes (Rev. to 2013) § 45a-648 provided, in relevant part, that "[a]n application for involuntary representation may be filed by any person alleging that a respondent is incapable of managing his or her affairs or incapable of caring for himself or herself and stating the reasons for the alleged incapability. . . ."

[2] The plaintiff does not seek to recover the debt accrued to it by Johnson prior to the defendant's appointment as conservator of Johnson's estate.

[3] See Office of the Probate Court Administrator, Connecticut Standards of Practice for Conservators (2018), available at http://www.ctprobate.gov/Documents/Connecticut%20Standards%20of20Practice%20for%20Conservators.pdf (last visited October 3, 2018).

[4] Unlike the defendant in *Jewish Home*, who was appointed as conservator of the ward's estate and person, the defendant in the present case was appointed conservator of Johnson's estate only. Our Supreme Court in *Jewish Home* relied on both § 45a-655 (a), which sets forth the duties of a conservator of the estate, and § 45a-656 (a), which sets forth the duties of a conservator of the person, in concluding that Cantore owed the plaintiff nursing home a duty to timely complete his ward's application for Medicaid benefits. Id., 539–43. Section 45a-656 (c) provides that the conservator of the person shall carry out his or her duties "either through the conserved person's own estate or through private or public assistance." At the time *Jewish Home* was decided, this language was included in subsection (a) of § 45a-656. *Jewish Home*, supra, 257 Conn. 540. For the reasons set forth in part II A of this opinion, we conclude that the fact that § 45a-656 references public assistance in this way does not undermine our ultimate determination that the conservator of the estate has a duty to assist the ward in applying for and obtaining public assistance.

[5] The defendant also cites *Krawczyk* v. *Stingle*, 208 Conn. 239, 543 A.2d 733 (1988), seemingly for the proposition that Connecticut's statutory scheme does not warrant holding conservators liable to third-party creditors of the ward. Our Supreme Court in *Krawczyk* considered whether an attorney could be held liable to the intended beneficiaries of his client's estate for his failure to arrange for timely execution of the client's estate planning documents. Id., 240. The court concluded that the defendant attorney could not be held liable to the beneficiaries because he did not owe them a duty of care. Id., 245–48. In its analysis of this issue, our Supreme Court noted that "[d]etermining when attorneys should be held liable to parties with whom they are not in privity is

a question of public policy." Id., 245. The court then went on to explain that, in addressing whether an attorney should be held liable to a third party, "courts have looked principally to whether the primary or direct purpose of the transaction was to benefit the third party. . . . Additional factors considered have included the foreseeability of harm, the proximity of the injury to the conduct complained of, the policy of preventing future harm and the burden on the legal profession that would result from the imposition of liability." (Citations omitted.) Id., 245–46.

In its analysis, the court placed significant weight on the fact that "[a] central dimension of the attorney-client relationship is the attorney's duty of [e]ntire devotion to the interest of the client. . . . This obligation would be undermined were an attorney to be held liable to third parties if, due to the attorney's delay, the testator [client] did not have an opportunity to execute estate planning documents prior to death. Imposition of liability would create an incentive for an attorney to exert pressure on a client to complete and execute estate planning documents summarily. Fear of liability to potential third party beneficiaries would contravene the attorney's primary responsibility to ensure that the proposed estate plan effectuate[d] the client's wishes . . . ." (Citations omitted; internal quotation marks omitted.) Id., 246.

*Krawczyk* is easily distinguishable for two reasons. First, the analysis in that case is controlled by the unique nature of the relationship between an attorney and his or her client, which is characterized by the attorney's duty of steadfast devotion to the interests of the client. See id.; see also Rules of Professional Conduct 1.7. Second, the imposition of liability here would not undermine the relationship between a conservator and the ward in the same way—in fact, doing so would arguably advance that relationship, because it would encourage conservators to carry out their duties to the ward with due care. See part II B of this opinion.

[6] General Statutes § 19a-533 (a) defines a "nursing home" in relevant part as "any chronic and convalescent facility or any rest home with nursing supervision . . . which has a provider agreement with the state to provide services to recipients of funds obtained through Title XIX of the Social Security Amendments of 1965 . . . ."

[7] We also note that, historically, many nursing homes have struggled to remain solvent. See General Statutes § 17b-339 (establishing nursing home financial advisory committee to "examine the financial solvency of nursing homes on an ongoing basis and to support the Departments of Social Services and Public Health in their mission to provide oversight to the nursing home industry on issues concerning the financial solvency of and quality of care provided by nursing homes"); see also Conn. Joint Standing Committee Hearings, Public Health, Pt. 10, 2017 Sess., p. 4780 (president and chief executive officer of Connecticut Association of Health Care Facilities noting that, in many larger urban nursing home facilities, percentage of Medicaid residents is close to 70 percent and that industry is in period of financial instability); Conn. Joint Standing Committee Hearings, Public Health, Pt. 6, 2009 Sess., p. 1763-65 (executive vice president of Connecticut Association of Health Care Facilities discussing in relation to Senate Bill No. 845, titled "An Act Concerning Oversight of Nursing Homes," insolvent nursing homes in state).

[8] Generally, our cases that have applied this test have referred to the "safety of the participants" because those cases involve activities that typically result in physical rather than financial harm. *See Lawrence* v. *O & G Industries, Inc.*, supra, 319 Conn. 659. That phraseology is somewhat inapt in circumstances, such as here, involving only allegations of financial harm. Thus, when we address the "safety" of the participants, we refer to the risk of financial harm presented by the alleged negligence.

[9] Pursuant to § 35.1 (b) of the Probate Court Rules, the Probate Court has broad discretion to waive the requirement of a probate bond.