******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# KATERI STREIFEL *v.* WILLIAM R. BULKLEY
## (AC 41239)

Lavine, Prescott and Harper, Js.

*Syllabus*

The plaintiff registered nurse sought to recover damages from the defendant for negligence in connection with injuries she sustained while providing medical care to the defendant, who was a patient in the radiation oncology department at the hospital where she worked. In her complaint, the plaintiff alleged that as she was assisting the defendant during the diagnostic procedure or medical treatment he was undergoing, he grabbed hold of her while he attempted to transition from a supine to a seated position on the examining table, and, as a result, she suffered several physical injuries. She claimed that her injuries were proximately caused by the defendant's negligence. The defendant filed a motion for summary judgment, asserting that the plaintiff's action was not viable because allowing a medical care provider to recover damages from her patient was contrary to public policy. The trial court granted the defendant's motion for summary judgment, concluding that the plaintiff failed to demonstrate that there was a genuine issue of material fact that the defendant, as a patient at the hospital, owed a duty of care to the plaintiff, who was providing him medical care as a registered nurse. On the plaintiff's appeal to this court, *held*:

1. The plaintiff could not prevail on her claim that the trial court improperly rendered summary judgment because the defendant's motion for summary judgment effectively challenged the legal sufficiency of her cause of action, and, therefore, that court should have treated the motion as a motion to strike to provide her with the opportunity to replead; because the plaintiff failed to object to the trial court's deciding the case through summary judgment or, in the alternative, to offer to amend her complaint if the court determined that the allegations were legally insufficient, she waived any claim that the trial court improperly failed to treat the motion for summary judgement as a motion to strike.

2. The plaintiff could not prevail on her claim that the trial court improperly granted the defendant's motion for summary judgment because the question of whether the defendant owed her a duty of care involved a question of fact reserved for the jury, which was based on her assertion that the court was obligated to first address, but failed to do so, whether the harm that she suffered was foreseeable before concluding whether a duty existed; the determination of whether a duty of care existed under the circumstances of this case was a question of law that the court was permitted to make at the summary judgment stage of the proceedings, and, in making that determination, the court was permitted to decide that no duty existed solely on public policy grounds.

3. The plaintiff's claim that applying the test articulated in *Murillo* v. *Seymour Ambulance Assn., Inc.* (264 Conn. 474) to determine whether recognizing a duty of care is inconsistent with public policy conflicts with this state's abolition of the doctrine of assumption of risk as a complete bar to recovery was unavailing; because our Supreme Court has continued to consider in cases involving medical treatment the normal expectation of the participants in analyzing the activity under review, including the statuses of the parties, even after the state's abolition of the doctrine of assumption of risk, this court was not prohibited by the abolition of that doctrine from applying the test articulated in *Murillo* to determine whether recognizing a duty of care was inconsistent with public policy, and the plaintiff reliance on *Sepega* v. *DeLaura* (326 Conn. 788) was misplaced, as there was no language in that case that even implied that our Supreme Court intended to abolish or retreat from the test in *Murillo*.

4. The plaintiff could not prevail on her claim that the trial court incorrectly determined that imposing a duty of care on the defendant while the plaintiff was furnishing medical care him was inconsistent with public policy, this court having declined to recognize, as a matter of law, that a patient owes a duty of care to avoid negligent conduct that causes harm to a medical care provider while the patient is receiving medical

care from that provider: this court's application of the relevant public policy considerations articulated in the test in *Murillo* indicated that all four factors weighed against recognizing a duty of care, specifically, the normal expectations of registered nurses and patients under the circumstances, balancing the unlikely enhancement to medical care provider and patient safety by recognizing a duty of care against the potential for higher medical care costs for patients caused by increased litigation, jeopardizing the confidentiality of medical information and the availability of a workers' compensation remedy for medical care providers, and the fact that no other jurisdiction has imposed a duty of care on a patient while receiving medical care from a medical care provider all weighed against recognizing a duty of care; moreover, this court's decision not to recognize a duty of care was predicated on the conclusion that uninhibited access to medical care for all prospective patients, the goal of encouraging patients to share sensitive information with their medical care providers without fearing the loss of confidentiality, and the safety of patients and medical care providers alike are vitally important to the integrity of the health care system in Connecticut.

Argued September 17, 2019—officially released January 14, 2020

*Procedural History*

Action to recover damages for the defendant's alleged negligence, and for other relief, brought to the Superior Court in the judicial district of Waterbury, where the court, *Brazzel-Massaro, J.*, granted the defendant's motion for summary judgment and rendered judgment thereon, from which the plaintiff appealed to this court. *Affirmed.*

*David V. DeRosa*, with whom was *Peter Rotatori III*, for the appellant (plaintiff).

*Janis K. Malec*, with whom was *Mary B. Ryan*, for the appellee (defendant).

*Opinion*

PRESCOTT, J. This appeal raises an issue of first impression in Connecticut: whether a patient may be liable under a theory of negligence for causing physical injuries to a medical care provider while that provider was furnishing medical care to the patient. We conclude, as a matter of law, that the law does not impose a duty of care on a patient to avoid negligent conduct that causes harm to a medical care provider while the patient is receiving medical care from that provider.[1]

The plaintiff, Kateri Streifel, appeals from the trial court's summary judgment in favor of the defendant, William R. Bulkley. She claims that the trial court improperly rendered summary judgment because (1) the court should have decided the defendant's motion for summary judgment as a motion to strike so as to afford her the opportunity to replead a legally sufficient cause of action, (2) determining whether a duty existed involves a question of fact for the jury to decide, and (3) assuming that determining whether a duty exists is a question of law for the court to decide, the court incorrectly determined that imposing a duty of care on the defendant while the plaintiff was furnishing medical care to him was inconsistent with public policy. We disagree with all three of the plaintiff's claims and, therefore, affirm the judgment of the trial court.

The record before the court, viewed in the light most favorable to the plaintiff as the nonmoving party, reveals the following facts and procedural history.[2] On March 18, 2014, the defendant was a patient in the radiation oncology department of Griffin Hospital undergoing an examination. At the time of the examination, "[t]he [d]efendant had a large body habitus." During the diagnostic procedure or medical treatment he was undergoing, the defendant was lying in a supine position.

The defendant then attempted to transition from a supine to a seated position on the examining table. In attempting to change positions, he grabbed hold of the plaintiff, who was the registered nurse assisting him. As a result of the defendant's physical contact with her, the plaintiff suffered several physical injuries.

The plaintiff commenced this action on February 25, 2016. In her one count complaint sounding in negligence, the plaintiff alleged that the injuries she suffered were proximately caused by the defendant's negligence. Specifically, the plaintiff alleged that the defendant caused harm to her in one or more of the following ways: "[1] [the defendant] applied pull force and/or torsion on the plaintiff while attempting to go from a supine position to a seated position; [2] [h]e applied an excessive amount of pull force and/or torsion on the plaintiff while attempting to go from a supine position to a seated position; [3] [h]e failed to immediately let

go of the plaintiff when falling back on the examining table; [4] [h]e failed to ask for medical and health care staffing for additional support to allow him to sit up; [5] [h]e failed to maintain proper balance while going from the supine position to the sitting position; [6] [h]e failed to give verbal notice to the plaintiff that he was not able to maintain his balance, position or posture on the examining table; [7] [h]e failed to provide adequate effort to transition himself from a supine position to a seated position when he was physically and intellectually able to do so; and [8] [h]e engaged in horseplay while on the examining table."

On November 9, 2016, the defendant filed a motion for summary judgment in accordance with Practice Book § 17-49. He asserted that "[t]he [p]laintiff does not have a viable cause of action because allowing a health care provider to recover against her patient is contrary to public policy . . . ." The trial court granted the motion for summary judgment on December 28, 2017, and issued a memorandum of decision setting forth its reasoning.

In its memorandum of decision, the trial court concluded that the plaintiff failed to demonstrate that there was a genuine issue of material fact that the defendant, as a patient at the hospital, owed a duty of care to the plaintiff, who was the nurse providing him medical care. In arriving at this conclusion, the trial court analyzed whether imposing a duty of care on the defendant was inconsistent with public policy. To support this determination, the trial court stated that recognizing a duty "would be more than opening the floodgates [to litigation; it] would be creating a tsunami with regard to actions against patient[s]." Furthermore, the trial court observed that the duty of care that the plaintiff sought to be recognized had not been acknowledged in other jurisdictions. In fact, the court stated that the only authorities the plaintiff cited to support the existence of a similar duty in other jurisdictions "involved not a claim of negligence but [instead] claims for assault and intentional acts by the patient." On the record, the trial court concluded that, as a matter of law, the defendant did not owe the plaintiff a duty of care under these circumstances, and, thus, the defendant was entitled to summary judgment.[3] This appeal followed.

We begin our analysis with the appropriate standard of review for a trial court's granting of a motion for summary judgment. "On appeal, [w]e must decide whether the trial court erred in determining that there was no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . . [O]ur review is plenary and we must decide whether the [trial court's] conclusions are legally and logically correct and find support in the facts that appear on the record. . . .

"Practice Book § [17-49] provides that summary judg-

ment shall be rendered forthwith if the pleadings, affidavits, and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . .

"A material fact is a fact that will make a difference in the outcome of the case. . . . Once the moving party has presented evidence in support of the motion for summary judgment, the opposing party must present evidence that demonstrates the existence of some disputed factual issue . . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § [17-45]. . . . The movant has the burden of showing the nonexistence of such issues but the evidence thus presented, if otherwise sufficient, is not rebutted by the bald statement that an issue of fact does exist. . . . To oppose a motion for summary judgment successfully, the nonmovant must recite specific facts . . . which contradict those stated in the movant's affidavits and documents." (Internal quotation marks omitted.) *Bank of America*, *N.A.* v. *Aubut*, 167 Conn. App. 347, 357–58, 143 A.3d 638 (2016).

I

The plaintiff first claims that, because the motion for summary judgment effectively challenged the legal sufficiency of the pleadings, the court should have treated the motion for summary judgment as a motion to strike to provide her with the opportunity to replead. Specifically, the plaintiff asserts that "[t]he pleadings in this case . . . could be cured by the plaintiff being allowed to replead the complaint to allege [a] specific allegation to establish the duty the defendant had to refrain from engaging in [conduct that put the plaintiff at risk of injury]." Furthermore, the plaintiff argues that, if she had been allowed to replead, then she could have pleaded assault and battery causes of action, which, she asserts, would amount to a legally sufficient complaint. We conclude that, by failing to raise this issue before the trial court, the plaintiff waived any claim that the trial court improperly failed to treat the motion for summary judgement as a motion to strike.

Our Supreme Court has set forth the appropriate circumstances in which a motion for summary judgment may be used instead of a motion to strike to challenge the legal sufficiency of a complaint. "[T]he use of a motion for summary judgment to challenge the legal sufficiency of a complaint is appropriate [if] the complaint fails to set forth a cause of action and the defendant can establish that the defect could not be

cured by repleading. . . . If it is clear on the face of the complaint that it is legally insufficient and that an opportunity to amend it would not help the plaintiff, we can perceive no reason why the defendant should be prohibited from claiming that he is entitled to judgment as a matter of law and from invoking the only available procedure for raising such a claim after the pleadings are closed. . . . It is incumbent on a plaintiff to allege some recognizable cause of action in his complaint. . . . Thus, failure by the defendants to demur to any portion of the . . . complaint does not prevent them from claiming that the [plaintiff] had no cause of action and that a judgment [in favor of the defendants was] warranted. . . . Moreover, [our Supreme Court] repeatedly has recognized that the desire for judicial efficiency inherent in the summary judgment procedure would be frustrated if parties were forced to try a case where there was no real issue to be tried." (Citations omitted; internal quotation marks omitted.) *Larobina* v. *McDonald*, 274 Conn. 394, 401–402, 876 A.2d 522 (2005).

To avoid waiving a right to replead, a nonmoving party must, before the trial court decides the summary judgment motion, either object to the trial court's deciding the case through summary judgment and argue that it should instead decide the motion as a motion to strike to afford it the opportunity to replead a legally sufficient cause of action or, in the alternative, the nonmoving party may maintain that its pleading is legally sufficient, but it must offer to amend the pleading if the court concludes otherwise. See *American Progressive Life & Health Ins. Co. of New York* v. *Better Benefits, LLC*, 292 Conn. 111, 124, 971 A.2d 17 (2009) ("a party does not waive its right to replead by arguing that the pleading is legally sufficient, but offering, if the court were to conclude otherwise, to amend the pleading").

In *Larobina* v. *McDonald*, supra, 274 Conn. 402, our Supreme Court stated that it "will not reverse the trial court's ruling on a motion for summary judgment that was used to challenge the legal sufficiency of the complaint when it is clear that the motion was being used for that purpose and the nonmoving party, by failing to object to the procedure before the trial court, cannot demonstrate prejudice. A plaintiff should not be allowed to argue to the trial court that his complaint is legally sufficient and then argue on appeal that the trial court should have allowed him to amend his pleading to render it legally sufficient. Our rules of procedure do not allow a [party] to pursue one course of action at trial and later, on appeal, argue that a path he rejected should now be open to him." (Internal quotation marks omitted.)

Turning to the present case, the defendant moved for summary judgment after the plaintiff served a complaint sounding in negligence and the defendant filed his answer and special defenses. In his motion for summary

judgement, the defendant stated that "[t]he [p]laintiff does not have a viable cause of action because allowing a health care provider to recover against her patient is contrary to public policy . . . ." In her objection to the motion for summary judgment and at oral argument before the trial court on the motion, the plaintiff failed to object to the court's deciding the motion as a motion for summary judgment and did not argue that the court should instead decide it as a motion to strike to allow her the opportunity to replead and set out a cause of action that is legally sufficient. Furthermore, the plaintiff failed to offer to amend her complaint if the trial court determined that the cause of action alleged was legally insufficient.

Because the plaintiff failed to object to the court's deciding the case through summary judgment instead of deciding the defendant's motion as a motion to strike or, in the alternative, to offer to amend the complaint if the court determined the allegations to be legally insufficient, she "has waived any objection to the use of the motion for that purpose and any claim that [she] should be permitted to replead." See *Larobina* v. *McDonald*, supra, 274 Conn. 403. Therefore, we conclude that the trial court properly decided the defendant's motion as a motion for summary judgment instead of as a motion to strike.

## II

The plaintiff also claims that the trial court improperly granted the defendant's motion for summary judgment because the question of whether the defendant owed the plaintiff a duty of care involves a question of fact.[4] Central to this claim is the plaintiff's assertion that the trial court was obligated to address, but failed to do so, the question of whether the harm allegedly suffered by the plaintiff was foreseeable before concluding whether a duty existed in this case. In other words, the plaintiff argues that the trial court improperly decided whether the defendant owed the plaintiff a duty of care as a matter of law because the analysis in which the court *should have* engaged involves a question of fact reserved for the jury. We disagree.

We first set forth the well settled legal principles concerning whether a court is required to address the foreseeability prong if, as a matter of law, the court determines that recognizing a duty of care on the defendant is inconsistent with public policy, and whether determining if a duty of care is owed is a question of law that the court may decide at the summary judgment stage. "Issues of negligence are ordinarily not susceptible of summary adjudication but should be resolved by trial in the ordinary manner." (Internal quotation marks omitted.) *Fogarty* v. *Rashaw*, 193 Conn. 442, 446, 476 A.2d 582 (1984). Nevertheless, "[t]he issue of whether a defendant owes a duty of care is an appropriate matter for summary judgment because the question is one of

law." (Internal quotation marks omitted.) *Mozeleski* v. *Thomas*, 76 Conn. App. 287, 290, 818 A.2d 893, cert. denied, 264 Conn. 904, 823 A.2d 1221 (2003).

"The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand. . . . [Our Supreme Court has] stated that the test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for [his] negligent conduct should extend to the particular consequences or *particular plaintiff* in the case. . . . The first part of the test invokes the question of foreseeability, and the second part invokes the question of policy." (Emphasis added; internal quotation marks omitted.) *Neuhaus* v. *DeCholnoky*, 280 Conn. 190, 217–18, 905 A.2d 1135 (2006). A court, however, is "not required to address the first prong as to foreseeability if [it] determine[s], based on the public policy prong, that no duty of care existed." Id., 218. "Foreseeability notwithstanding, it is well established that Connecticut courts will not impose a duty of care on [a defendant] if doing so would be inconsistent with public policy." *Monk* v. *Temple George Associates, LLC*, 273 Conn. 108, 116, 869 A.2d 179 (2005). "If a court determines, as a matter of law, that a defendant owes no duty to a plaintiff, the plaintiff cannot recover in negligence from the defendant." (Internal quotation marks omitted.) *Grenier* v. *Commissioner of Transportation*, 306 Conn. 523, 539, 51 A.3d 367 (2012).

In the present case, the trial court granted the defendant's motion for summary judgment because it determined that, as a matter of law, the defendant, as a patient, did not owe a duty "to protect the [plaintiff] medical provider from falling forward when the [defendant] sought her assistance" when transitioning from a supine position on the examining table. In arriving at this conclusion, the trial court refrained from determining whether the harm the plaintiff suffered was foreseeable and proceeded to determine that, as a matter of public policy, the defendant did not owe the plaintiff a duty of care while receiving medical care from her. Because the determination of whether a duty of care exists under the circumstances is a question of law that the court is permitted to make at the summary judgment stage and, in making this determination, the court may decide that no duty exists solely on public policy grounds, we conclude that the trial court did not improperly decide a factual question reserved for the jury. Accordingly, we reject this claim.

III

The plaintiff next claims that, even if determining whether a duty exists is a question of law that may be decided at the summary judgment stage, the court improperly granted the defendant's motion for summary judgment because recognizing that a patient owes a duty of care to a medical care provider (medical provider) while that provider is furnishing medical care to that patient is in fact consistent with public policy. We disagree with the plaintiff and, therefore, decline to recognize that a patient owes a duty of care to a medical provider while receiving medical care from that provider.[5]

Our Supreme Court has set forth the inquiry to determine if recognizing a duty of care contradicts public policy. "A simple conclusion that the harm to the plaintiff was foreseeable . . . cannot by itself mandate a determination that a legal duty exists. Many harms are quite literally foreseeable, yet for pragmatic reasons, no recovery is allowed. . . . A further inquiry must be made, for we recognize that duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection. . . . [Although] it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realities of this world. Every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree. . . . The final step in the duty inquiry, then, is to make a determination of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results." (Internal quotation marks omitted.) *Murillo* v. *Seymour Ambulance Assn., Inc.*, 264 Conn. 474, 479–80, 823 A.2d 1202 (2003).

"Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual." (Internal quotation marks omitted.) *Lodge* v. *Arett Sales Corp.*, 246 Conn. 563, 571, 717 A.2d 215 (1998). "[I]t is well established that Connecticut courts will not impose a duty of care on [a defendant] if doing so would be inconsistent with public policy." *Monk* v. *Temple George Associates, LLC*, supra, 273 Conn. 116. As previously noted, our Supreme Court recognizes "four factors to be considered in determining the extent of a legal duty as a matter of public policy: (1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of

other jurisdictions." *Murillo* v. *Seymour Ambulance Assn., Inc.*, supra, 264 Conn. 480; see also *Bloomfield Health Care Center of Connecticut, LLC* v. *Doyon*, 185 Conn. App. 340, 358, 197 A.3d 415 (2018). In the present case, all four factors weigh against recognizing that a patient owes a duty of care to a medical provider while receiving medical care from that provider.[6]

A

Before we address the factors for determining whether imposing a duty of care on the defendant is inconsistent with public policy, we first consider the plaintiff's argument that, if we consider the normal expectations of the parties in the activity under review and do not recognize that the defendant owed the plaintiff, a health care provider, a duty of care, then we are improperly basing that conclusion on the doctrine of assumption of risk, a tort principle that Connecticut has abolished as a complete bar to recovery. In making this argument, the plaintiff relies primarily on our Supreme Court's decision in *Sepega* v. *DeLaura*, 326 Conn. 788, 803–804, 167 A.3d 916 (2017), and asserts that "a defendant cannot escape liability for conduct simply by relying on the plaintiff's occupation placing them in a class from whom the defendant needs immunity from liability." We disagree with the plaintiff's argument that our conclusion that no duty exists in the present case may be premised only by relying on the doctrine of assumption of risk.

The doctrines of last clear chance and assumption of risk have been abolished in Connecticut. General Statutes § 52-572h (*l*); see also *Wendland* v. *Ridgefield Construction Services, Inc.*, 190 Conn. 791, 797, 462 A.2d 1043 (1983) ("[t]he central purpose of § 52-572h was to abolish the harsh common law rule that the doctrines of contributory negligence, last clear chance and assumption of risk operated as a complete bar to recovery" [emphasis omitted]). In *Wendland*, our Supreme Court concluded that, "[i]n determining the relative negligence of each party . . . the factors relevant to the assumption of risk doctrine may be considered by the trier. As long as the jury is properly instructed concerning the doctrine of comparative negligence . . . [then] elements involving the failure of the plaintiff to comprehend a risk may be specially pleaded and weighed by the trier in determining the propriety and totality of the plaintiff's conduct in relation to that of the defendant." (Citation omitted.) *Wendland* v. *Ridgefield Construction Services, Inc.*, supra, 797–98.

Although the doctrine of assumption of risk as a complete bar to recovery has been abolished, our Supreme Court has continued to consider the normal expectations of parties in cases involving medical treatment in order to analyze whether recognizing a duty of care is inconsistent with public policy. See, e.g., *Jarmie* v. *Troncale*, 306 Conn. 578, 603–605, 50 A.3d 802 (2012);

id., 605 ("[t]he normal expectations of the parties . . . weigh heavily against extending the duty of health care providers to victims of their patients' unsafe driving"); *Murillo* v. *Seymour Ambulance Assn., Inc.*, supra, 264 Conn. 480–81; id., 480 ("[g]iven the urgent need of the plaintiff's sister for medical care, the normal expectations of the participants would be that the [medical providers] would focus their effort to provide medical assistance on the plaintiff's sister, their patient, who was in need of emergency surgery . . . [and] would not require the [medical providers] also to keep a watchful eye on the plaintiff, who chose to observe while her sister [received medical care]"). Furthermore, in assessing the normal expectations of the parties, we need to consider the statuses of those individuals providing and receiving medical care. See *Jarmie* v. *Troncale*, supra, 604 (court considered defendant's status as physician in concluding that "the [defendant] would not have expected [his] liability to extend to the plaintiff in this case"); *Murillo* v. *Seymour Ambulance Assn., Inc.*, supra, 480 (court considered status of defendants as medical providers in concluding that "[t]he normal expectations of the participants would not require the defendants . . . to keep a watchful eye on the plaintiff, who chose to observe while her sister underwent the insertion of the IV needle into her arm"). Because our Supreme Court has continued to consider the normal expectations of the participants in analyzing the activity under review, including the statuses of the parties, even after § 52-572h was last amended in 1999, we are not convinced that this state's abolition of the doctrine of assumption of risk as a complete bar to recovery prohibits this court from conducting the test articulated in *Murillo* v. *Seymour Ambulance Assn., Inc.*, supra, 264 Conn. 480, and *Bloomfield Health Care Center of Connecticut, LLC* v. *Doyon*, supra, 185 Conn. App. 358, for determining whether recognizing a duty of care is inconsistent with public policy.

Furthermore, our Supreme Court's decision in *Sepega* is distinguishable from the present case for two reasons. In *Sepega*, the court considered whether the common-law firefighter's rule, which "provides, in general terms, that a firefighter or police officer who enters private property in the exercise of his or her duties generally cannot bring a civil action against the property owner for injuries sustained as the result of a defect in the premises . . . should be extended beyond the scope of premises liability so as to bar a police officer from recovering, under a theory of ordinary negligence, from a homeowner who is also an alleged active tortfeasor." (Citation omitted.) *Sepega* v. *DeLaura*, supra, 326 Conn. 789.

First, the Supreme Court concluded *only* that one of the policy considerations[7] in support of the *firefighter's rule* "operate[d] as a veiled form of an assumption of risk analysis."[8] Id., 803. Importantly, however, the court

*did not* opine more broadly on the relationship between (1) the general test for determining whether a court should recognize as a matter of public policy a duty on a class of individuals and (2) the state's abolition of assumption of risk.[9] There is no language in *Sepega* that would even imply that the court intended to abolish or retreat from the four-pronged test articulated in *Murillo* v. *Seymour Ambulance Assn., Inc.*, supra, 264 Conn. 480, and other cases. See, e.g., *Jarmie* v. *Troncale*, supra, 306 Conn. 603; *Bloomfield Health Care Center of Connecticut, LLC* v. *Doyon*, supra, 185 Conn. App. 358.

Second, in *Sepega*, the court determined that barring police officers, *as a class*, from bringing actions sounding in negligence amounted to assumption of risk. See id., 804. In the present case, however, our determination that the defendant did not owe the plaintiff a duty of care is predicated on our conclusion that imposing a duty of care on a patient *while receiving medical care* is inconsistent with this state's public policy. Thus, our decision does not preclude medical providers from recovering from patients for negligence in all circumstances. For these reasons, we disagree with the plaintiff's argument that applying the test to determine whether recognizing a duty of care is inconsistent with public policy conflicts with this state's abolition of the doctrine of assumption of risk as a complete bar to recovery.

B

Having addressed the plaintiff's assumption of risk argument, we now consider the first factor of the test for determining whether recognizing a duty of care is inconsistent with public policy, namely, the normal expectations of the participants in the activity under review. In the present case, on March 18, 2014, the defendant was a patient in the radiation oncology department at Griffin Hospital undergoing a diagnostic procedure or receiving medical treatment that required him to lie in a supine position on an examining table. The plaintiff was a registered nurse in that department and was assisting the defendant during the diagnostic procedure or medical treatment he was undergoing. Our consideration of the normal expectations of a patient while receiving medical care and of a nurse while furnishing it is tempered by whether those expectations are reasonable. See *Murillo* v. *Seymour Ambulance Assn., Inc.*, supra, 264 Conn. 480–81; see also *Vendrella* v. *Astriab Family Ltd. Partnership*, 311 Conn. 301, 322, 87 A.3d 546 (2014) ("[w]ith respect to the first factor, we can perceive no reason why a reasonable person would not expect the owner or keeper of a domestic animal to take reasonable steps to prevent the animal from causing foreseeable injuries").

The plaintiff argues that a medical provider in this situation would not expect to suffer the injuries she sustained because she would not have expected the

patient to make physical contact with her. Furthermore, she argues that, if the defendant anticipated that he could not maintain his balance, then he had an obligation to ask for "additional support."

The defendant argues that the "[p]laintiff's description of expectations is nonsensical and would require a patient to announce his every move and ask for virtually continual assistance." Additionally, the defendant asserts that "[b]ased upon the specific allegations of the defendant's behavior, there is a clear implication that the plaintiff was positioned physically close to the defendant at the time she was 'assisting' the defendant. It is reasonable to expect that, by training, the plaintiff would be aware that the patient, as a large person supine on an examination table in a hospital radiation oncology department, might have difficulty sitting up and might fall back when attempting to transition." The defendant then implies that "it was reasonable for the defendant [in the present case] to expect that the plaintiff . . . would render such assistance. Further, it was reasonable for the defendant to expect the plaintiff to anticipate that he may have difficulties, and for the plaintiff to seek the assistance of other staff members with his transition to a sitting position."

Having considered these arguments and the public policies of this state, we conclude that it is reasonable for a patient to expect that, while receiving medical care, a medical provider will focus on and address the medical needs of the patient, who often may request and rely on the assistance of his or her medical provider. Conversely, it is reasonable for a medical provider to expect that he or she is responsible for the patient's medical needs and safety while furnishing medical care to the patient. Moreover, if a patient requests assistance, then a medical provider can reasonably expect that it is his or her responsibility to furnish the requested aid to the patient, and that, if the medical provider is unable to provide the requested aid on his or her own, then the provider is expected to summon help to assist in providing the requested aid to the patient.

In analyzing the relevant factors in determining whether recognizing a duty in a particular instance is inconsistent with public policy, we note that "our statutes themselves are a source of public policy, and may militate in favor of recognizing a common-law duty of care when doing so advances the general policies and objectives of the statute. . . . Thus, in determining the normal expectations of the parties, our appellate courts have often looked to Connecticut's existing body of common law and statutory law relating to th[e] issue." (Citation omitted; internal quotation marks omitted.) *Bloomfield Health Care Center of Connecticut, LLC* v. *Doyon,* supra, 185 Conn. App. 359.

Our determination of the reasonable expectations of a patient and a medical provider during the provision

of medical care to the patient is buttressed by what our legislature has determined are the expectations of a registered nurse. "The practice of nursing by a registered nurse is defined as the process of diagnosing human responses to actual or potential health problems, *providing supportive and restorative care*, health counseling and teaching, case finding and referral, *collaborating in the implementation of the total health care regimen*, and executing the medical regimen under the direction of a licensed physician, dentist or advanced practice registered nurse." (Emphasis added.) General Statutes § 20-87a (a). Although this statute pertains to occupational licensing, it nevertheless establishes that our legislature expects registered nurses, like the plaintiff, to focus on the needs of the patient and to collaborate with others if necessary to address the patient's medical needs.

Similarly, our Supreme Court has stated that medical providers are expected to prioritize the needs of the patient to whom they are administering medical care. See *Murillo* v. *Seymour Ambulance Assn., Inc.*, supra, 264 Conn. 478, 480 (defendant medical providers did not owe duty of care to plaintiff who was watching her sister receive medical care because, in part, "[g]iven the urgent need of the plaintiff's sister for medical care, the normal expectations of the participants would be that the defendants would focus their effort to provide medical assistance on the plaintiff's sister, their patient, who was in need of emergency surgery . . . [and] would not require the defendants also to keep a watchful eye on the plaintiff, who chose to observe while her sister underwent the insertion of the IV needle into her arm"); *Maloney* v. *Conroy*, 208 Conn. 392, 403, 545 A.2d 1059 (1998) ("Medical judgments as to the appropriate treatment of a patient [should not be] influenced by the concern that a visitor may become upset from observing such treatment . . . . The focus of the concern of medical care practitioners should be upon the patient and any diversion of attention or resources to accommodate the sensitivities of others is bound to detract from that devoted to patients.").

In light of the expectations of registered nurses and medical providers stated in this mosaic of authorities, in the present case, it was reasonable for the defendant, as a patient, to expect that he could receive assistance from the nurse attending to him if he needed it and that if she required help transitioning him from a supine position, then she could request it from another hospital staff member. Conversely, it was reasonable for the plaintiff, as a nurse, to expect that her patient, whom she described as having a "large body habitus" and who may have been suffering from an illness or disease, would require assistance transitioning from a supine position on the examining table and that, if she were unable to help him sit up on her own, then she could have requested help from a hospital staff member. For

these reasons, the first factor of the public policy prong of our duty analysis weighs against the plaintiff's claim that the defendant owed her a duty of care.

C

We next consider the second and third factors, namely, "the public policy of encouraging participation in the activity, while weighing the safety of the participants . . . [and] the avoidance of increased litigation . . . ." *Murillo* v. *Seymour Ambulance Assn., Inc.*, supra, 264 Conn. 480. Because those factors are analytically related, we consider them together. See *Lawrence* v. *O & G Industries, Inc.*, 319 Conn. 641, 658, 126 A.3d 569 (2015); see also *Bloomfield Health Care Center of Connecticut, LLC* v. *Doyon*, supra, 185 Conn. App. 370.

With respect to these factors, the plaintiff argues that failing to recognize that a patient owes a medical provider a duty of care while that provider is furnishing medical care to that patient would discourage medical providers from providing medical care to their patients out of fear of being injured. Furthermore, the plaintiff argues that failing to recognize a duty of care may increase the likelihood that medical providers use force against their patients to protect themselves and thus put patients at a greater risk of harm. She also argues that litigation will not increase, even if we recognize this duty, because "[t]his case is an anomaly in the law."

In response, the defendant argues that there is an inherent benefit to society in encouraging persons to seek or to continue to receive medical treatment. Recognizing a duty of care, the defendant asserts, would chill prospective patients from seeking treatment and put current patients at a greater risk of harm because they may be less likely to request the physical assistance of medical providers while receiving treatment.

"We recognize that, with respect to the third factor which contemplates the concern of increased litigation, [i]t is [often] easy to fathom how affirmatively imposing a duty on the defendants . . . could encourage similarly situated future plaintiffs to litigate on the same grounds; that is true anytime a court establishes a potential ground for recovery. . . . Because of this, in considering these two factors, our Supreme Court at times has employed a balancing test to determine whether, in the event that a duty of care is recognized by the court, the advantages of encouraging participation in the activity under review outweigh the disadvantages of the potential increase in litigation." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Bloomfield Health Care Center of Connecticut, LLC* v. *Doyon*, supra, 185 Conn. App. 371. Thus, the relevant inquiry in the present case is whether recognizing a duty in this context would further encourage patients to use reasonable care when receiving medical care and, if so, whether the advantages of encouraging such

behavior would outweigh the negative effects of a corresponding increase in litigation and the barriers to obtaining medical care that recognizing a duty of care might create. Cf. id.

Having considered the arguments of the parties and having balanced (1) the unlikely enhancement to patient and medical provider safety by recognizing a duty of care against (2) the potential for higher medical care costs for patients caused by increased litigation, (3) jeopardizing the confidentiality of medical information, and (4) the availability of a workers' compensation remedy for medical providers, we conclude that the second and third factors militate against recognizing a duty of care.

### 1

### Safety of Patients and Medical Providers

The plaintiff argues that declining to recognize a duty of care under these circumstances would result in medical providers being discouraged from providing care to their patients out of fear of being injured. Furthermore, the plaintiff argues that, by not recognizing a duty of care, patients and medical providers would be less safe in circumstances in which medical care is being furnished than if we recognize a duty. Although we take seriously the safety of patients and medical providers alike, we disagree with the plaintiff.

Medical professionals every day have provided high quality health care to patients for generations in the absence of a recognized duty of care on their patients. The plaintiff has offered no empirical evidence that would suggest that individuals considering the medical field as a profession have chosen to pursue other occupations because of concerns that they would be barred from recovering against patients that might injure them in the course of providing medical care to those patients. Thus, history, experience, and common sense tell us that, even though this court declines to impose a duty of care on patients receiving medical care, providers will not be chilled from continuing to provide care to their patients. Therefore, the plaintiff's argument is unavailing.

### 2

### Cost of Medical Care and Risk of Increased Litigation

On the other hand, permitting medical providers to bring an action against patients for negligence while receiving medical care potentially will impose financial disincentives on patients to seek medical care, which is inconsistent with the public policy of this state. As with the first factor, we look to statutes and the common law, which themselves are a source of public policy, to determine whether recognizing a duty of care is inconsistent with the public policy of this state. See id., 359. Our legislature has averred that cost should not be a

barrier to Connecticut residents from obtaining medical care. General Statutes § 19a-7a provides: "The General Assembly declares that it shall be the goal of the state to assure the availability of appropriate health care to all Connecticut residents, *regardless of their ability to pay*. In achieving this goal, the state shall work to create the means to assure access to a single standard of care for all residents of Connecticut, on an equitable financing basis and with effective cost controls. In meeting the objective of such access, the state shall ensure that mechanisms are adopted to assure that care is provided in a cost effective and efficient manner." (Emphasis added.)

Were we to conclude that patients owe medical providers a duty of care while receiving medical care, patients ultimately would bear the cost of this decision, either directly by having to litigate claims of negligence that could be brought against them as a consequence of seeking medical care, or indirectly through increased insurance premiums. As our Supreme Court has stated, creating a new cause of action creates benefits for some at the expense of others. See *Mendillo* v. *Board of Education*, 246 Conn. 456, 487, 717 A.2d 1177 (1998), overruled on other grounds by *Campos* v. *Coleman*, 319 Conn. 36, 37–38, 123 A.3d 854 (2015). Thus, recognizing a cause of action against patients for harms sustained by medical providers furnishing medical care to the patients would likely place a heftier financial burden on patients receiving medical care.

Nevertheless, the plaintiff argues that, because "[t]his case is an anomaly in the law," we would not be opening the floodgates to litigation if we recognize a duty of care under these circumstances. In other words, concern for increased litigation and, therefore, higher costs for patients is unwarranted because the plaintiff's case is unique and similar cases would rarely, if ever, appear on a court docket again. This reasoning, however, falsely assumes that, because there has been a scarcity of medical providers suing their patients for negligence *without* a duty of care having been recognized, the same would be true *after* a duty is recognized.

Moreover, contrary to what the plaintiff argues, recognizing a negligence cause of action against patients has the potential to turn a drought of litigation into a flood of it because providers could sue patients for acts that are unintentional and less outrageous than that for which a patient may already be held liable. As the trial court recognized, medical providers can sue patients "for an intentional act or an assault." In the present case, by deciding that, while receiving medical care, a patient does not owe a duty of care to a medical provider, we conclude neither that a medical provider is barred from suing a patient for intentional torts, such as a battery or an assault, nor that a provider is proscribed from suing a patient for reckless conduct

resulting in injury. These causes of action, however, require more deliberate or extreme conduct for a defendant to be held liable than that of negligence, i.e., for an intentional tort, the act must be intentional, and for recklessness, the conduct must be wilful, wanton or reckless, whereas to be held liable for negligence, a plaintiff merely needs to show a defendant failed to "exercise that degree of care which is sufficient to avoid unreasonable risk of harm to the defendant." D. Pope, Connecticut Actions and Remedies: Tort Law (1996) §§ 1:03, 2:03, 25:04, 25:13. Thus, by allowing medical providers to sue patients for negligence for harms sustained while furnishing medical care to those patients, we can reasonably infer that this would expose patients to a higher risk of being sued by their medical providers.

Because patients would be exposed to a higher risk of being sued by their medical providers and, thus, likely to incur greater medical costs, recognizing that a patient owes a duty of care to a medical provider while receiving medical care would have the potential to discourage patients from seeking medical care when they need it. When deciding whether to seek medical assistance, patients would have to account for the possibility that receiving aid from a medical provider could come at the cost of being sued for negligence. For instance, patients who have difficulty balancing themselves would have to decide whether to seek the assistance of the attending medical provider and risk an action, or to avoid potential costly litigation but possibly suffering physical harm by falling or by allowing their underlying illness to remain untreated. Therefore, the stated public policy of our legislature of ensuring that cost is not a barrier to obtaining medical care conflicts with imposing a duty of care on patients receiving medical care because the higher costs to patients associated with their greater exposure to liability would have a chilling effect on patients seeking medical care.

3

Confidentiality of Patient Medical Information

Our Supreme Court has expressed significant concerns regarding "interfere[nce] with the physician-patient relationship [that may] discourage patients from seeking treatment and care from their health care providers." *Jarmie* v. *Troncale*, supra, 306 Conn. 605–606; see also id., 624–25. Chief among the threats to the sanctity of the relationship between a patient and his or her medical provider is the loss of confidentiality of the patient's medical information that would occur in an action brought by the provider against the patient. See id., 607–609 ("[w]hen [the] confidentiality [of a patient's medical information] is diminished to any degree, it necessarily affects the ability of the parties to communicate, which in turn affects the ability of the physician to render proper medical care and advice"). If such an action were permitted, the mere filing of the

action may disclose confidential medical information about the patient and the patient arguably would be forced to divulge further confidential medical information about him or herself in order to argue that care was exercised in light of the limitations imposed on the patient by any medical conditions.

To promote and protect the confidentiality of patient information, our legislature has carved out *only* limited exceptions to the general rule that a patient's medical information may not be disclosed by a medical provider without the explicit consent of the patient or the patient's authorized representative.[10] General Statutes § 52-146o provides in relevant part: "Except as provided in [other statutes], in any civil action . . . a physician or surgeon . . . or other licensed health care provider, shall not disclose [any medical information of a patient], unless the patient or that patient's authorized representative explicitly consents to such disclosure. . . . Consent of the patient or the patient's authorized representative shall not be required for the disclosure of such communication or information (1) pursuant to any statute or regulation of any state agency or the rules of court, (2) *by a physician, surgeon or other licensed health care provider against whom a claim has been made, or there is a reasonable belief will be made, in such action or proceeding, to the physician's, surgeon's or other licensed health care provider's attorney or professional liability insurer or such insurer's agent for use in the defense of such action or proceeding,* (3) to the Commissioner of Public Health for records of a patient of a physician, surgeon or health care provider in connection with an investigation of a complaint, if such records are related to the complaint, or (4) if child abuse, abuse of an elderly individual, abuse of an individual who is physically disabled or incompetent or abuse of an individual with intellectual disability is known or in good faith suspected." (Emphasis added.)

We determine that § 52-146o militates against recognizing a duty of care under the circumstances of the present case. Despite enumerating other limited exceptions to the general rule that a medical provider may not reveal a patient's medical information without the consent of the patient or the patient's authorized representative, our legislature has not recognized an exception to patient confidentiality if a medical provider decides to sue a patient. Indeed, our legislature did create an exception to confidentiality when a claim is made by a patient *against a health care provider.* See General Statutes § 52-146o (a) (2). The clear overall intent of this provision is to place in the patient's hands decision-making authority as to when his or her confidential medical information may be disclosed to third parties. Therefore, we conclude that this statute is instructive and weighs against recognizing a duty of care.

If we were to decide that a patient owes a duty of care to a medical provider to avoid negligence while receiving care from that provider, then patients would be more inclined to consider whether sensitive medical information might be revealed with others as a consequence of seeking medical care. For example, in the present case, we reasonably can infer from the complaint that the defendant was receiving treatment for cancer because he was seen in the radiation oncology department of Griffin Hospital. This is information of a sensitive nature that the defendant may have wanted to shield from friends, coworkers, and the general public. Now that an action for negligence has been filed against him, however, this information is in the public domain. Having had his medical information disclosed through the initiation of the plaintiff's action, the defendant may be more inclined to consider whether his medical information will be revealed *the next time* he seeks medical care.

Recognizing a duty in this case would necessarily entail placing in the medical provider's hands greater decision-making authority as to when and how much confidential information may be disclosed to third parties. This power risks fundamentally interfering with the sanctity of patients' relationships with their medical providers and militates strongly against recognizing a duty of care in this case.

4

Workers' Compensation Remedy for Medical Providers

Another reason weighing against recognizing that a patient owes a medical provider a duty of care while the provider is furnishing medical care to the patient is that the provider, if harmed by a patient, often can recover workers' compensation benefits. See General Statutes § 31-291 et seq. Our courts previously have considered the availability of workers' compensation to a plaintiff as a factor militating against allowing subsequent recovery from the person who engendered harm. See *Lodge* v. *Arett Sales Corp.*, supra, 246 Conn. 584; see also *Demers* v. *Rosa*, 102 Conn. App. 497, 502–503, 505 n.6, 925 A.2d 1165, cert. denied, 284 Conn. 907, 931 A.2d 262 (2007).[11] Having medical providers recover workers' compensation benefits for injuries sustained while furnishing medical care instead of permitting them to recover from negligent patients allows providers to receive some measured compensation for injuries sustained at work while avoiding the societal costs of imposing a duty of care on patients receiving medical care. For these reasons, the likely availability of a workers' compensation remedy to medical providers militates against recognizing a duty of care.

The plaintiff nevertheless argues that workers' compensation is insufficient because it does not allow her to recover for *all* damages to which she might otherwise

be entitled if the defendant were found liable for negligence. Full compensation of the plaintiff, however, is not the only consideration we must take into account when deciding whether to impose liability on a defendant. In deciding whether it is appropriate to impose liability on a defendant, "[w]e . . . note the three fundamental purposes of our tort compensation system, which are the compensation of innocent parties, shifting the loss to responsible parties or distributing it among appropriate entities, and deterrence of wrongful conduct . . . ." (Internal quotation marks omitted.) *Bloomfield Health Care Center of Connecticut, LLC* v. *Doyon*, supra, 185 Conn. App. 358.

With the purposes of tort compensation in mind, our Supreme Court has refused to allow two public employees to recover damages from defendants for negligence when those public employees had a workers' compensation remedy available to them. See *Lodge* v. *Arett Sales Corp.*, supra, 246 Conn. 578–79, 581, 584–86. In *Lodge*, our Supreme Court declined to impose a duty of care on the defendants, even though recognizing a duty would have allowed the plaintiffs to recover more than what workers' compensation provided, because "the social costs associated with liability [were] too high to justify [the duty's] imposition . . . ." Id., 584.[12] The court then "[c]ounterbalanc[ed] the *limited benefit* of providing these plaintiffs with greater compensation than is available through workers' compensation and other statutory disability and survivor benefits [against] the significant costs that would derive from imposing liability under the facts presented." (Emphasis added.) Id. Having conducted this balancing, the court declined to recognize a duty because "when the social costs associated with liability are too high to justify its imposition, no duty will be found." Id.

Most medical providers, through workers' compensation, have an alternative remedy to that of tort compensation to recover for injuries sustained while working. Given the costs associated with allowing a medical provider to sue a patient for negligence for injuries sustained while furnishing medical care, we conclude, like our Supreme Court in *Lodge*, that the benefit of allowing this plaintiff to recover beyond what workers' compensation affords her is minimal. See id. Therefore, the availability of workers' compensation to the plaintiff weighs against recognizing a duty of care because the plaintiff is able to recover for some of her damages in a manner that avoids the social costs of imposing a duty of care on patients while receiving medical care.

Having considered the arguments of parties and various policy considerations stated by our legislature and our Supreme Court, we conclude that the costs of imposing a duty of care on a patient while receiving medical care outweigh the benefits. Specifically, the prospect of chilling patients from seeking medical care

due to potentially higher expenses and concern for the loss of confidentiality of their medical information, both of which are a consequence of increased litigation, weigh heavily against recognizing a duty. Also weighing against recognizing a duty is that medical providers can be compensated for injuries sustained while providing medical care through workers' compensation. The insignificant advantages of recognizing a duty, namely, an unlikely improvement in patient and medical provider safety and the limited benefit of allowing providers to recover beyond workers' compensation, are significantly outweighed by the costs of doing so. For these reasons, the second and third factors militate against imposing a duty of care on patients while receiving medical care.

## D

The fourth and final factor that we consider in conducting our public policy analysis is the law of other jurisdictions on this issue. See *Bloomfield Health Care Center of Connecticut, LLC* v. *Doyon*, supra, 185 Conn. App. 376; see also *Murillo* v. *Seymour Ambulance Assn., Inc.*, supra, 264 Conn. 480. In their appellate briefs, neither the plaintiff nor the defendant cite to case law of other jurisdictions that pertain to the exact issue in the present case, i.e., whether a patient can be held personally liable to a medical provider, under a theory of negligence, for breaching a duty of care and causing physical harm to the provider while receiving medical care from that provider. Moreover, our independent research has not uncovered any reported decisions from other jurisdictions that have directly addressed this precise issue. Because the cases cited by the parties are readily distinguishable from the present case, and no other jurisdiction appears to have recognized a duty of care on a patient who is receiving medical treatment, we conclude that the fourth factor weighs against recognizing a duty.[13]

The plaintiff proffered cases to this court in her appellate brief and to the trial court to support the proposition that courts in other jurisdictions have not rejected outright that a patient can be held liable for harms a medical provider suffered as a result of the patient's conduct. See *Mullen* v. *Bruce*, 168 Cal. App. 2d 494, 498, 335 P.2d 945 (1959); *McGuire* v. *Almy*, 297 Mass. 323, 329–30, 8 N.E.2d 760 (1937); *Gioia* v. *Ratner*, Superior Court of Massachusetts, Essex County, Docket No. 1477CV00676, 2016 WL 4729355 (August 9, 2016) (33 Mass. L. Rptr. 508); *Van Vooren* v. *Cook*, 273 App. Div. 88, 93, 75 N.Y.S.2d 362 (1947), reargument denied, 273 App. Div. 941, 78 N.Y.S.2d 558 (1948). These cases are distinguishable, however, because they do not involve claims of negligence but, instead, seek recovery for assault and intentional acts by the patient. See *Mullen* v. *Bruce*, supra, 168 Cal. App. 2d 495–96; *McGuire* v. *Almy*, supra, 297 Mass. 324–25; *Gioia* v. *Ratner*, supra,

33 Mass. L. Rptr. 508; *Van Vooren* v. *Cook*, supra, 273 App. Div. 90–91. Thus, these cases offer no support for permitting a medical provider to sue a patient for *negligence* for harms that the provider incurred while furnishing medical care to the patient.

Because neither party has proffered, nor has our independent research yielded, a reported case from another jurisdiction that is sufficiently similar to the facts and issues at hand in the present case, we conclude that the fourth factor weighs against recognizing a duty in the present case. See *Jarmie* v. *Troncale*, supra, 306 Conn. 622.

E

Conclusion

Having considered the arguments of the parties and the public policy considerations stated by our legislature and our Supreme Court, we conclude that recognizing that a patient owes to a medical provider giving him or her medical treatment a duty to avoid negligent conduct is inconsistent with the public policy of this state. Our decision is predicated on our conclusion that uninhibited access to medical care for all prospective patients, the goal of encouraging patients to share sensitive information with their providers without fearing the loss of confidentiality, and the safety of patients and providers alike are vitally important to the integrity of the health care system in Connecticut.

In reaching this conclusion, it is important to delineate what we do not purport to decide. First, our decision should not be read to encompass a conclusion regarding the viability of a cause of action brought by a medical provider against a patient for harm suffered as a result of the patient's intentional torts or for conduct that is reckless, wanton, or malicious. Our decision also should be construed as being limited only to circumstances in which the alleged negligence occurs while the patient is receiving medical treatment and results in physical harm to the medical provider. Furthermore, we do not opine on whether a medical provider may assert a claim for negligence against a patient for injuries sustained during a time or activity less directly involving the provision of medical care or treatment; for example, if a patient carelessly discarded a gown at the entrance to his or her hospital room and a nurse tripped and fell on it when entering the room. Indeed, paramount to our decision that the defendant did not owe the plaintiff a duty of care to avoid negligence in the present case is that the plaintiff sustained her injuries while she was providing medical care to her patient, the defendant. Accordingly, having conducted a plenary review of the record, we conclude that the trial court properly rendered summary judgment in favor of the defendant.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] For a discussion about what we do not purport to decide in reaching this conclusion, see part III E of this opinion.

[2] Because we must view the record in the light most favorable to the plaintiff as the nonmoving party and neither the plaintiff nor the defendant submitted an affidavit or any documentary evidence, we limit our recitation of the facts to what is alleged in the complaint. See *Bank of America, N.A.* v. *Aubut*, 167 Conn. App. 347, 358, 143 A.3d 638 (2016) ("[i]n deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party" [internal quotation marks omitted]).

In her appellate brief, the plaintiff nevertheless attempted to add to the material allegations of the complaint. For example, the plaintiff accuses the defendant of having engaged in "rough, boisterous, buffoonery clown like conduct while [the defendant] was fully aware of his large body size." The complaint, however, does not allege that the defendant engaged in this type of conduct. Moreover, the plaintiff did not submit an affidavit or documentary evidence to the trial court in support of these allegations. See Practice Book §§ 17-45 (b) and 17-49.

[3] In its memorandum of decision, the trial court stated that the test for whether recognizing a duty of care to a plaintiff is inconsistent with public policy is comprised of two factors, namely, "the avoidance of increased litigation and . . . the decisions of other jurisdictions." The trial court concluded that both factors militated against imposing a duty of care on a patient while receiving medical care.

That test, however, contains four factors. See *Murillo* v. *Seymour Ambulance Assn., Inc.*, 264 Conn. 474, 480, 823 A.2d 1202 (2003) (determining that there are "four factors to be considered in determining the extent of a legal duty as a matter of public policy: (1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions").

In our application of the public policy test, we consider *all* four factors and conclude that all four weigh against imposing a duty of care on the defendant under these circumstances. In the end, we arrive at the same conclusion as the trial court; the defendant owed no duty of care to the plaintiff while receiving medical care from her.

[4] "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." *RK Constructors, Inc.* v. *Fusco Corp.*, 231 Conn. 381, 384, 650 A.2d 153 (1994).

[5] In *Sepega* v. *DeLaura*, 326 Conn. 788, 792, 167 A.3d 916 (2017), quoting *Levandoski* v. *Cone*, 267 Conn. 651, 661, 841 A.2d 208 (2004), our Supreme Court stated that, "because the firefighter's rule is an exception to the general rule of tort liability that, as between an innocent party and a negligent party, any loss should be borne by the negligent party, the burden of persuasion is on the party who seeks to extend the exception beyond its traditional boundaries." (Internal quotation marks omitted.) The defendant in *Sepega* argued that the firefighter's rule should be extended in order to bar the plaintiff police officer's action for negligence against him. See id., 789–92. In that case, our Supreme Court concluded that the defendant failed to meet his burden of persuasion. *Sepega* v. *DeLaura*, supra, 815.

It is unclear whether a defendant who argues that a duty of care should not be recognized because it is inconsistent with public policy has the burden of persuading that a plaintiff should not be allowed to recover from him or her for negligence. We note that, in cases in which our Supreme Court used the test to determine whether recognizing a duty is inconsistent with public policy, the court did not opine on whether the defendants in those cases had the burden of persuasion. See generally *Jarmie* v. *Troncale*, 306 Conn. 578, 50 A.3d 802 (2012); *Murillo* v. *Seymour Ambulance Assn., Inc.*, 264 Conn. 474, 823 A.2d 1202 (2003). If, however, the defendant in the present case had the burden of persuading the court that the plaintiff was not allowed to recover from him for negligence, then we conclude that the defendant met his burden for the reasons stated in this opinion.

[6] The plaintiff asserts that the trial court incorrectly rendered summary judgment because the court improperly "shift[ed] the burden of proof to the plaintiff to establish facts and evidence to support a claim of horseplay when it is the defendant's burden on summary judgment to prove the absence of horseplay in order to prevail." Having read and considered the complaint in its entirety, we construe the plaintiff's allegation that the defendant

engaged in horseplay to be a specification of negligence. See *Travelers Ins. Co.* v. *Namerow*, 261 Conn. 784, 795, 807 A.2d 467 (2002) (stating that "[t]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically . . . [and that] [a]lthough essential allegations may not be supplied by conjecture or remote implication . . . the complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties" [citations omitted]). Assuming that the defendant engaged in horseplay, we do not address this issue because we conclude that the trial court correctly determined that, as a matter of law, the defendant did not owe the plaintiff a duty of care while the defendant was receiving medical care from her. Thus, whether the defendant engaged in horseplay does not affect our decision that the plaintiff cannot recover from the defendant for negligence for harms sustained while the defendant was a patient receiving medical care from the plaintiff.

For similar reasons, we do not address the plaintiff's argument that the defendant is liable for negligence because "[a] person lacking coordination or suffering from an infirmity must use a degree of reasonable care that one lacking normal coordination would also use." That argument involves whether the defendant *breached* a duty of care to the plaintiff. We, however, conclude that the trial court correctly determined that, as a matter of law, the defendant owed no duty of care to the plaintiff while the defendant was receiving medical care from her. Therefore, we do not address whether the defendant breached a nonexistent duty.

[7] The policy consideration in support of the firefighter's rule that the Supreme Court scrutinized is "[t]o avoid placing too heavy a burden on premises owners to keep their premises safe from the unpredictable entrance of fire fighters . . . ." (Internal quotation marks omitted.) *Sepega* v. *DeLaura*, supra, 326 Conn. 802.

[8] When weighing this policy consideration in support of the firefighter's rule, our Supreme Court took issue with "focusing on a firefighter or police officer as a *class* from whom a premises owner needs immunity from liability, not on the reasonableness of the activity of the premises owner in the circumstances . . . [because the] legislature of this state . . . has abolished the assumption of risk doctrine." (Emphasis added.) Id., 803. Therefore, the court determined that "the first policy consideration operates as a veiled form of an assumption of risk analysis" and that "this policy consideration fails to support an extension of firefighter's rule in the present case." Id. The court then concluded that "[i]t would be both unfair and incongruous, therefore, for this court to rely on the assumption of risk doctrine as a basis for extending the firefighter's rule beyond premises liability claims when the clear public policy of our state is contrary to the very rationale for that doctrine. Regardless of the continuing vitality of the firefighter's rule as it relates to premises liability claims, it certainly should not be extended on the basis of the common-law doctrine of assumption of risk." Id., 803–804.

[9] There are some noticeable differences between the factors used to determine whether recognizing a duty of care is inconsistent with public policy and the policy considerations in support of the firefighter's rule. Compare *Murillo* v. *Seymour Ambulance Assn., Inc.*, supra, 264 Conn. 480 ("[w]e previously have recognized four factors to be considered in determining the extent of a legal duty as a matter of public policy: (1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions"), with *Sepega* v. *DeLaura*, supra, 326 Conn. 802–803 ("The most often cited policy considerations [in support of the firefighter's rule] include: (1) [t]o avoid placing too heavy a burden on premises owners to keep their premises safe from the unpredictable entrance of fire fighters; (2) [t]o spread the risk of . . . injuries to the public through workers' compensation, salary and fringe benefits; (3) [t]o encourage the public to call for professional help and not to rely on self-help in emergency situations; and (4) [t]o avoid increased litigation. . . . Proponents also cite double taxation as another policy consideration in favor of the firefighter's rule." [Citations omitted; internal quotation marks omitted.]).

[10] Although it is a matter of federal law and not necessarily indicative of the public policy of Connecticut, we are concerned that allowing a medical provider to sue a patient for negligence may result in the release of patient information that is protected by the Health Insurance Portability and

Accountability Act of 1996 (HIPAA), 42 U.S.C. § 1320d et seq. Indeed, *in this case*, whether the release of the defendant's medical information violated HIPAA was raised before the trial court.

[11] In *Sepega*, our Supreme Court disagreed with the argument that the firefighter's rule should be extended to preclude the plaintiff police officer from recovering for a claim of negligence because the police officer received workers' compensation benefits, which spreads the risk of injury to the public. See *Sepega* v. *DeLaura*, supra, 326 Conn. 805–807. The court stated that, if the firefighter's rule was extended for this reason, police officers would be treated differently than other public sector employees who are allowed to recover for injuries through *both* workers' compensation *and* tort claims. See id., 805–806.

Our conclusion that, in the present case, the plaintiff's ability to recover worker's compensation benefits militates against recognizing a duty of care is not inconsistent with *Sepega*. Rather, our analysis follows the balancing test our Supreme Court used in *Lodge*, in which the court weighed the benefit of allowing the plaintiff in that case to recover in tort after having received workers' compensation benefits against the societal costs of recognizing a duty of care. See *Lodge* v. *Arett Sales Corp.*, supra, 246 Conn. 584. Thus, in accordance with *Sepega*, we do not predicate our conclusion that workers' compensation militates against recognizing a duty of care on the loss-spreading rationale.

[12] At issue in *Lodge* was "whether the defendants, who negligently caused the transmission of a false fire alarm, are liable to firefighters injured during an accident precipitated by the negligent maintenance and failure of the brakes on the responding fire engine." *Lodge* v. *Arett Sales Corp.*, supra, 246 Conn. 566. The plaintiffs received workers' compensation benefits for their injuries and "brought [an] action against [the defendants] seeking to hold them liable for the full extent of the plaintiffs' harm owing to the negligent transmission of the false alarm to which the plaintiffs were responding when they were killed or injured." Id., 570. Our Supreme Court reversed the trial court's judgment in favor of the plaintiffs, concluding that "the defendants owed no duty to the plaintiffs in these circumstances because: (1) the harm was not reasonably foreseeable; and (2) the fundamental policy of the law, as to whether the defendant[s'] responsibility should extend to such results . . . weighs in favor of concluding that there should be no legal responsibility of the defendants to the plaintiffs under the circumstances. (Citations omitted; emphasis omitted; internal quotation marks omitted.) Id., 567, 577. Furthermore, the court concluded that, "[b]ecause firefighters knowingly engage in a dangerous occupation, [this court has] concluded that they are owed only the limited duty owed to licensees by landowners upon whose property they sustain injury in the course of performing their duty. . . . The policies supporting the application of a narrow scope of duty owed by individual landowners to firefighters counsels us to conclude that it would be inappropriate to establish a broad scope of duty owed by these defendants to guard against unforeseen consequences. It would be irrational to conclude that firefighters are owed a greater duty by individual members of the public while they are en route to the scene of an emergency than when they arrive at the scene. The plaintiffs have been compensated for their risk by society as a whole by way of workers' compensation as well as other statutory benefits provided to injured firefighters. . . . To impose additional liability on the defendants under these circumstances would impose an undue burden on individual members of the public." (Citations omitted; footnote omitted.) Id., 580–81.

Moreover, in declining to recognize a duty of care under the circumstances in *Lodge*, the court concluded that the social costs weighing against recognizing a duty were "compelling," stating that "[i]f one who initiates a false alarm may be liable for those consequences that are not reasonably foreseeable, but, rather, are significantly attenuated from the original negligent conduct, that liability will impose an unreasonable burden on the public. The costs stemming from this undue burden may include a substantial chilling of the willingness to report an emergency prior to investigating further to determine whether it is legitimate. Such delay may cost precious time, possibly leading to the unnecessary loss of life and property. It also may reduce the willingness of property owners to install alarms for fear of liability." Id., 584–85.

[13] The defendant cites to two lines of cases, but these, too, are distinguishable. In the first category, the defendant relies on Louisiana appellate court decisions involving negligence claims in which the court determined that a patient owed no duty of care to the patient's caretaker while the caretaker

was performing tasks for which the caretaker was hired. See *Griffin* v. *Shelter Ins. Co.*, 857 So. 2d 603, 606 (La. App. 2003) ("[t]he risk of [the defendant] grabbing [the plaintiff's] arm while she was transferring from the wheelchair to the easy chair was clearly one of the types of risks that [the plaintiff] was contractually obligated to guard against," and, therefore, "[u]nder the facts and circumstances, [the defendant] simply did not owe a duty to [the plaintiff] to guard against the particular risk that gave rise to the [defendant's] injuries"), cert. denied, 864 So. 2d 635 (La. 2004); see also *Chirlow* v. *Gilotra*, 52 So. 3d 138, 139, 140 (La. App. 2010) (holding that plaintiff suffering from cerebral palsy owed no duty of care to caretaker when, "[f]or unknown reasons [the defendant] became agitated and grabbed [the] plaintiff by the arm," because the "[p]laintiff was contractually obligated to bathe [the defendant], and the risk of injury occurring due to his lack of muscular control was one that [the] plaintiff not only assumed, but which she had had at least some training in avoiding"); but see *Sanders* v. *Alger*, 242 Ariz. 246, 449–50, 394 P.3d 1083 (2017) (holding that "based on the direct relationship between caregiver and patient, the latter owes a duty of reasonable care with respect to conduct creating a risk of physical harm to the caregiver" but stating that "[r]ecognizing a duty by patients to their caregivers is not, of course, the same as saying that patients will be liable for injuries incurred by a caregiver in doing his or her job or that the patient's standard of care is the same as that of a caregiver").

The decisions in these cases are of a little value in our determination for two reasons. First, the plaintiffs in these cases were in-home caretakers, not medical providers. See *Griffin* v. *Shelter Ins. Co.*, supra, 857 So. 2d 604, 606; *Chirlow* v. *Gilotra*, supra, 52 So. 3d 139. In the present case, however, the plaintiff is a registered nurse. Second, the decisions relied heavily on the doctrine of assumption of risk. See *Griffin* v. *Shelter Ins. Co.*, supra, 857 So. 2d 606; *Chirlow* v. *Gilotra*, supra, 52 So. 3d 140. Connecticut, however, has abolished the doctrine of assumption of risk as a complete bar to recovery. Thus, these cases have limited applicability to the present case.

In the second category, the defendant cites to cases involving negligence claims in which courts in other jurisdictions have concluded that patients who are mentally ill, while receiving medical care, did not owe a duty of care to their hospital or nursing home caretakers. See *Colman* v. *Notre Dame Convalescent Home, Inc.*, 968 F. Supp. 809, 813, 814 (D. Conn. 1997) (holidng that "although a mentally disabled adult ordinarily is responsible for injuries resulting from her negligence, no such duty of care arises between an institutionalized patient and her paid caregiver" and stating that "[s]everal other states have found that there is no liability for injuries suffered by a paid hospital attendant as a result of a patient's negligence"); *Herrle* v. *Estate of Marshall*, 45 Cal. App. 4th 1761, 1770, 1772, 53 Cal. Rptr.2d 713 (1996) ("we [are not] aware of any body of case law which stands for the proposition that health care providers can sue their patients for injuries inherent in the very condition for which treatment was sought," and "[t]herefore it would be unfair to now impose on defendant the very duty of care which she had contracted for plaintiff to supply"); *Mujica* v. *Turner*, 582 So. 2d 24, 25 (Fla. App.) ("as a matter of law the defendant's decedent, as an institutionalized Alzheimer's patient, owed no duty of due care to plaintiff who was the decedent's caretaker at the . . . [nursing home]"), review denied, 592 So. 2d 681 (Fla. 1991); *Creasy* v. *Risk*, 730 N.E.2d 659, 667 (Ind. 2000) ("the relationship between [an Alzheimer's patient] and [his certified nursing assistant] and public policy concerns dictate that [the patient] owed no duty of care to [his certified nursing assistant]"); *Berberian* v. *Lynn*, 845 A.2d 122, 129 (N.J. 2004) (holding that "a mentally disabled patient, who does not have the capacity to control his or her conduct, does not owe his or her caregiver a duty of care"); cf. *Gould* v. *American Family Mutual Ins. Co.*, 198 Wis. 2d 450, 463, 543 N.W.2d 282 (1996) ("[w]hen a mentally disabled person injures an employed caretaker, the injured party can reasonably foresee the danger and is not innocent of the risk involved," and "[t]herefore . . . a person institutionalized . . . with a mental disability, and who does not have the capacity to control or appreciate his or her conduct cannot be liable for injuries caused to caretakers who are employed for financial compensation" [internal quotation marks omitted]). These cases, however, are also of limited utility in our determination because, unlike the present case in which the defendant's mental capacity is not at issue in determining whether he owed the plaintiff a duty of care, these cases rely heavily on the defendant's diminished mental capacity in determining whether a duty was owed.